(No. 30934.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ALBERT GOODEN, Plaintiff in Error.

*Opinion filed May 19, 1949.*

JOSEPH E. CLAYTON, JR., of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, W. S. MIROSLAWSKI, and EDWARD F. HEALY, all of Chicago, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Albert Gooden, hereinafter called the defendant, was indicted in the criminal court of Cook County for the crime of armed robbery. He entered a plea of not guilty, was tried before a jury and at the close of all the evidence was found guilty as charged in the indictment. He was sentenced to the penitentiary for a term of not less than four nor more than eight years. He brings

his cause here on writ of error contending he was not proved guilty beyond a reasonable doubt in that the identification of defendant by the prosecuting witness is vague and uncertain; and that this, in connection with the evidence tendered on his part to establish an alibi, raises a reasonable doubt of his guilt.

The facts and circumstances as shown by the evidence are as follows: On the evening of March 15, 1947, Charles Benton, the prosecuting witness, arrived at his home from his place of business around 8:45 P.M., carrying with him money he had collected in his business as a newspaper distributor. Shortly after he arrived at his home, and while he was counting the money collected, the doorbell rang. He left the money in the kitchen and went to answer it. Upon opening the front door he found two men standing there who made inquiries as to whether one Foreman resided there. At this particular time the doorway was lighted only by a street light located in front of the house. After a few minutes conversation one of the men drew a gun, covered the lower part of his face with a handkerchief and ordered Benton into the house, both men following him. Benton was conducted to the kitchen where the armed man seized the money he had been counting and demanded to know where the rest of his money and his watch could be found. In the meantime the other man had ransacked the various rooms in the house and returned to the kitchen. Benton then told them there was some money in his bedroom which they took, after which they searched Benton, taking some money from his pockets. The armed man then took Benton to the dining room and the other man went to the front window and looked out through the blinds. At this particular point a woman who lived in the basement of the house came up the stairs into the dining room at which time the armed man ordered her to sit down. The man who had been at the front window thrust his head into the archway of the living room and said, "Come on,

let's go," whereupon the robbers tore the telephone loose from the wall of the living room and left through the front door. The police were called from an extension phone in the basement and Benton testified that he gave them a description of the robbers. It will be observed, however, that what that description was does not appear in the record, and the woman who came from the basement at the time of the robbery gave no description but said she could slightly identify the unmasked robber.

About eleven days later, March 26, 1947, Benton went down to the bureau of identification of the Chicago police department where he examined six or seven hundred pictures of men and picked out the picture of defendant as the unmasked robber. Nine months later, December 20, 1947, Benton was notified by the police that they had arrested a man they thought was one of the robbers, and told him to come to the Town Hall police station. When Benton arrived, he was shown a line-up of three men from which he designated the defendant as the unmasked man who had robbed him.

On the trial Benton testified that during the robbery all the lights in his home were burning except in the living room; that he had observed the unmasked robber five or six times during the fifteen or twenty minutes consumed in the robbery; that he had never seen either of the robbers prior thereto nor since that time until he identified defendant as the robber who had worn no mask and had ransacked his home. Upon cross-examination he stated that he identified defendant by his triangular face, sunken in on one side, by his mustache, by his build and by the carriage of his shoulders which were thrust forward as he walked. Benton further testified that at the time of the robbery defendant was shabbily dressed, wore a dark topcoat and trousers, a dark hat with the brim turned down and that the man whose picture he selected at the bureau of identification did not have on a hat and was without a mustache.

A Mrs. Munsey, who was the woman who came up from the basement at the time of the robbery, testified she saw only the upper part of the unmasked robber's body and that from a side view she could "slightly" identify him. It does not appear that she ever identified the defendant as being the man who took part in the robbery.

Several witnesses took the stand and testified in behalf of the defendant, their testimony being offered for the purpose of establishing an alibi. One Doctor Rosen, a practicing physician, testified that during the month of March, 1947, the defendant was under his treatment at the home of defendant's mother, suffering from lobar pneumonia. His testimony discloses that he made eight or ten visits to care for, and to prescribe for, the defendant during that month, but did not remember the dates of the visits or the duration of defendant's illness.

William Morris testified that defendant was confined to his bed at his mother's home from about March 3 or 4, 1947, until early in April and that he visited him there every day on his way to work. It will be observed that his positive testimony that the defendant was in bed during the month of March is supported by the testimony of Doctor Rosen that during the month of March defendant had lobar pneumonia and that he made eight or ten visits to care for and to prescribe for him.

One Charles Griffin testified that it was customary for defendant and himself to celebrate their birthdays together, and that he had visited the defendant on March 9, 1947, defendant's birthday, and he was confined to his bed at his mother's home; that on his own birthday, March 16, 1947, he again visited defendant and found him confined to his bed at his mother's home.

Chester Smith, defendant's stepfather, testified that defendant was brought to his home sick on March 8, 1947; that he remembered the date because the following day was

defendant's birthday; that defendant remained in his home sick until March 20 or 24.

Melvina Smith, the defendant's mother, testified that she brought the defendant to her home on March 8, 1947, and that he was continuously confined to his bed until about March 18, after which he was able to get up but not able to leave the house until March 28. She testified he was confined to his bed and did not leave her home on March 15, 1947, the day of the robbery.

The defendant testified in his own behalf and denied that he had participated in the robbery and testified that on the date of the robbery he was sick and confined to his bed at his mother's home and that he had never seen Benton prior to December 20, 1947, the date Benton picked him out of the line at the police station.

It is apparent that the conviction in this case rests solely on the identification of the defendant by the prosecuting witness. The first question presented is whether by that evidence the People have sustained their burden of proving guilt beyond all reasonable doubt.

It will be observed from the record in this case that the masked man at the time of the robbery directed the actions of Benton and commanded his attention by the force of a gun. The other robber, who Benton testified was defendant, for most of the time during the robbery was out of the presence of the prosecuting witness. The prosecuting witness had never seen either of the robbers before the date of the robbery, nor did he see anyone that he thought was either of them afterward until defendant was in the line at the showup on December 20, 1947, more than nine months later. It is true that eleven days after the robbery Benton selected the defendant from a picture as being that of the unmasked robber, and although he testified on the trial that one of the distinguishing characteristics of the unmasked robber was a mustache, the picture which he

selected did not show a mustache. The record does not disclose any evidence that Benton, prior to his testimony on the trial, told anyone that the robber wore a mustache. It is apparent that the only reason that Benton was called to the police station to view the defendant was that he had designated defendant's picture as being that of one of the robbers, and not by reason of any characteristics which Benton had testified on the trial had enabled him to identify the defendant. The principal distinguishing feature of the unmasked robber according to Benton was his mustache which he described as peculiarly thin and extending the width of the robber's mouth and separated by a shaven gap under the nose. It will be observed, however, that when Benton selected the picture from the great number given to him at the bureau of identification the picture he selected as being that of the robber was that of a man wearing no mustache. No testimony is disclosed by the record that Benton mentioned the absence of the mustache from the man in the picture to anyone.

It is quite possible that the face in the picture examined by Benton at the bureau of identification would remain indelibly upon his mind, and having fixed an association of defendant's picture in his mind in connection with the robbery, it is quite possible that upon viewing defendant in the line-up Benton might have been influenced by what he had observed in the picture. The fact that the man in the picture had no mustache and the further fact, as testified to by Benton, that the man who robbed him had a mustache, which from the record Benton did not mention to anyone, would at least indicate that there might be some effort at identification without paying attention to the necessary details. A man who has worn a mustache does not usually look the same when it has been removed and often such change in appearance is strikingly noticeable. The evidence discloses no facts or circumstances in the record which in any way corroborate the identification made, nor any evi-

dence that prior to the date of the line-up from which defendant was selected by Benton the characteristics which Benton testified to were the basis of his identification. In this respect the identification amounts to no more than a statement that the defendant was the guilty man.

In addition to the possibility of mistake in identification is the unimpeached alibi testimony of the defendant himself and five other witnesses, three of them unrelated to the defendant and one being the attending physician, whose testimony, taken with the other witnesses and analyzed, discloses that at the time of the robbery defendant was seriously ill and confined to his bed at his mother's home apparently with lobar pneumonia.

This court has repeatedly held that in a criminal case the burden rests upon the People not only to prove beyond a reasonable doubt the commission of the crime charged but also to establish by the same degree of proof the perpetration of the crime by the person accused. (*People* v. *Buchholz,* 363 Ill. 270.) It is true this court has held that while the identification and whereabouts of the defendant when the crime was committed are questions for the jury, yet where it can be seen from the entire record there is a reasonable doubt of the guilt of the defendant a judgment of conviction cannot be permitted to stand. (*People* v. *Ricili,* 400 Ill. 309.) Evidence of an alibi cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime charged, and while the identification and whereabouts of the defendant when the crime was committed are questions for the jury, yet where, from the entire record, there is a reasonable doubt of the guilt of the defendant because of the uncertainty of identification, the conviction cannot stand. (*People* v. *Ricili,* 400 Ill. 309; *People* v. *Burr,* 356 Ill. 452; *People* v. *McPheron,* 354 Ill. 381; *People* v. *Steinbuch,* 306 Ill. 441.) It is well settled that where there is evidence fairly tending to estab-

lish an alibi such evidence cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime. *People* v. *Buchholz*, 363 Ill. 270; *People* v. *Gold*, 361 Ill. 23; *People* v. *Peck*, 358 Ill. 642.

This record discloses a serious question as to whether the uncorroborated testimony of Benton is sufficient to establish the identity of the defendant as the guilty man beyond all reasonable doubt. In direct opposition to this proof of identification is the unimpeached testimony of the defendant and five other witnesses which fairly tends to establish an alibi. In this state of the record we are of the opinion it cannot be said that the guilt of the defendant is established as a moral certainty which admits of no reasonable doubt of his guilt.

For the reasons above set forth, the judgment is reversed.

*Judgment reversed.*