**People of the State of Illinois, Plaintiff-Appellee, v. Alfred Luckey and Roscoe Hannah, Otherwise Called Judah Israel, Defendants-Appellants.**

Gen. Nos. 52,013, 52,017. (Consolidated.)

First District, First Division.

May 25, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Herbert Becker, Norman W. Fishman, and William Dean, Assistant Public Defenders, of counsel), for appellants.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Joseph Romano, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

Defendants were found guilty of armed robbery in a bench trial, in which defendant, Alfred Luckey, was sentenced to serve a term of one to four years in the penitentiary and defendant, Roscoe Hannah, two to five years. The defendants seek to reverse their convictions upon the following contentions:

(1) That the trial court erroneously accepted their jury waiver which was not understandingly made in open court; and

(2) That the evidence did not establish their guilt beyond a reasonable doubt.

 With regard to the first issue, we think there is no merit to the defendants' contention. The record discloses a colloquy between the trial judge and the defendants. The trial judge asked both men whether they knew of their right to a jury trial, what the right consisted of and whether they were willing to waive that right and be tried by the judge. To each of these questions the defendants answered that they understood what was meant by a jury waiver and consented to be tried by the judge. There is nothing in the record to

17

indicate that they did not hear or understand what was said to them about a jury trial. The defendants' right to a jury trial was understandingly waived and the trial court's explanation of that right was adequate.

 No definite formula has been established to determine whether an accused has understandingly waived his right to trial by jury. The decision in each case must rest on the particular circumstances of each case. People v. Wesley, 30 Ill2d 131, 195 NE2d 708 (1964) ; People v. Bell, 104 Ill App2d 479, 244 NE2d 321 (1969). The cases relied upon by defendants are distinguishable in that in those decisions the accused did not have an adequate understanding in order to properly waive a jury trial. In the instant case the record shows that defendants adequately understood that they were foregoing a trial by jury.

The second issue requires a review of the evidence which supported defendants' convictions. The crime occurred on February 14, 1966, sometime after 3:00 o'clock in the afternoon at the Wallis Department Store in Chicago. The complaining witness was Felipe Rodriguez, who was the manager of the store. He stated that both defendants entered the store at the same time with Luckey going to the shoe department and Hannah walking around in the paint department. The witness was stationed behind the cash register and his helper, Eugene Carter, was engaged in assisting Luckey, who was looking for a pair of shoes. After browsing around, defendant Hannah left the store but returned. Luckey had a pair of shoes and both defendants were inquiring of Carter as to the price of a leather coat.

Rodriguez turned his back and was surprised by Hannah, who placed a gun behind his head. He felt the gun but did not see it. They proceeded to the cash register which was opened by Rodriguez. Hannah handed the gun to Luckey who then ordered Carter to come over. According to Rodriguez, Hannah then ordered the manager ·

and his helper to a washroom in the back of the store. Hannah had the gun at this time. The witness and Carter went to the washroom and Luckey warned them not to move or he would kill them. Rodriguez said Luckey opened the door and warned them on three separate occasions. About 10 or 15 minutes later, another helper, Robert Carr, opened the washroom door. Rodriguez called the police and ascertained that about $300 was missing from the cash register and about 25 silver dollars had been taken.

The witness said he saw defendant Luckey in a lineup at a police station on February 16, 1966. He noticed that Luckey was wearing a style of shoes that was sold in the store. The witness stated that when Luckey entered the store on February 14, 1966, he was wearing brown shoes but later he was wearing a pair of Stacey brand shoes which Carter had been showing Luckey in the shoe department. The witness stated he saw Hannah in the police station on February 19, 1966. He had never seen either defendant prior to the robbery.

On cross-examination, the witness explained that the store sold many different brands of shoes besides the brand defendant Luckey was wearing. Rodriguez said that the store was busy before and at the time of the robbery. His description of Hannah was that he was wearing a three-quarter length dark coat with a persian lamb hat which the witness described as a "Prussian cap" that was greenish in color. The only thing that Rodriguez could recall about defendant Luckey was that he was wearing a hat and the testimony concerning his shoes. The witness described the store as being about 60 feet square with the cash register approximately in the middle. He stated that he was too distant from the shoe store to hear any conversation between Luckey and the helper Carter.

The witness did not recall the description he gave to the police on the date of the robbery. On the 16th of

February he was picked up by a police officer and taken to a station at 8:00 o'clock in the evening. At the station he was shown four or five men in a lineup from which he picked out the defendant Luckey. The only thing the witness recalled of the clothes Luckey was wearing was a pair of Stacey brand shoes, which were noticed because someone asked the defendant what type of shoes he was wearing. The identification of Hannah was at a police station on February 19, but the witness could not recall what type of clothing Hannah was wearing on that date. Rodriguez could not remember whether he had testified to the grand jury that the defendants had a shotgun at the time of the robbery.

The State called Eugene Carter, the helper in the store, who testified that the defendants walked into the store shortly after 3:00 o'clock on the afternoon of February 14, 1966, and were looking at merchandise. The defendant Luckey asked to see some shoes and Hannah left the store after looking at other merchandise. Defendant Hannah then reappeared in a few seconds and was walking around the store. Carter showed Hannah where the washroom was after the latter had requested directions. Carter stated that Luckey had tried on a pair of black Stacey shoes, size 10½, while carrying his brown shoes. Carter then noticed that Hannah was standing behind Rodriguez who was at the cash register of the store. The witness said Hannah was holding a shotgun, which he described as sawed-off, single barrel, twelve gauge shotgun. Carter was about five or six feet from the cash register. Luckey moved over to the cash register and Hannah passed the gun to him. Luckey pointed the weapon at Carter and took the witness and Rodriguez to the washroom where they were told to lie down by Luckey. Carter's last glimpse of Hannah was of going behind the cash drawer and then walking toward the front of the store. The witness said that Luckey came

back to the washroom three or more times, warning the witness and Rodriguez if they moved, he would shoot them. After about 10 or 15 minutes in the washroom, a part-time worker, Robert Carr, opened the washroom door.

Carter stated further that he had never seen either defendant prior to the robbery. He subsequently viewed these men at the police lineups where he identified them as the two men who committed the robbery. Carter said he picked out defendant Luckey at a police station on February 16, at a lineup consisting of five negro males. Carter said someone asked Luckey what type of shoes he was wearing and defendant replied they were a Stacey brand. A few days later, the witness picked out defendant Hannah from another police lineup which consisted of seven negro males.

On cross-examination Carter said that the defendant Hannah was wearing dark clothes, consisting of a long dark trench coat and a cap. Defendant Luckey was described as wearing a hat and a light jacket, characterized as a dress type coat. The witness stated that he went to a police station on February 16 and February 18, upon the request of the police. On these respective dates, the witness picked out defendant Luckey and then defendant Hannah. Carter said he talked to a detective Robbins on each date in the presence of the manager, Rodriguez, at the police station.

Robert Carr, a part-time worker at the store testified for the State. He said he arrived for work at about 3:38 p. m., on February 14 and noticed the front door was locked, but he was let in by a short man in a dark coat. He also noticed a tall man pick up a sweater then point a sawed-off shotgun at him and ordered him to go in the back. The witness said he could not identify the short man but identified defendant Luckey as the tall man with the shotgun. The witness went to the shoe

21

department and lay down on the floor. He was told not to get up and stayed there for three minutes. The witness then got up and let Carter and Rodriguez out of the washroom. Carter said he next saw Luckey at a police station where he picked him out of a lineup of some five colored men. Carr recalled that someone asked the defendant what kind of shoes he was wearing and also recalled that the short man left the store but that Luckey remained for about fifteen seconds longer. Carr also said that Luckey was in his presence for about three or four minutes. Following a stipulation of the defendants' ages, the State rested its case.

The defense called police officer William Robbins who had investigated this robbery and had questioned the three witnesses for the State. Robbins stated that Rodriguez described one of the robbers as being about five feet eleven inches tall, thin build and as having a thin mustache. The second man was described by Rodriguez as being shorter with a heavier build and wearing a black imitation fur hat. Robbins was asked when he first saw Hannah. He responded that it was on the 19th of February and that he believed Hannah had a little mustache, which he described as a heavy mustache and later a comparatively thin, medium mustache. Officer Robbins stated he interviewed all three State's witnesses while they were in the same room. Robbins recalled that Rodriguez stated the shorter man was wearing dark clothes but the witness could not remember what Rodriguez said about the taller man.

The defendant Luckey then testified as to his activities on the date of the robbery. He then lived at 4850 West Adams in Chicago. He stated he got up early on February 14 to look for a job around 9:00 a. m. The defendant said his wife was sick and he went to a neighbor, Regina Curry, to see if she could sit with his wife. Luckey testified he spent the entire day in his apart-

ment sitting with his wife and neighbor. He said they were engaged in reading the Bible and that he was a Jew. When asked by defense counsel what his religion was, he stated he was "not a religious person, not really." Luckey stated that the occupants of his apartment took turns reading from the Bible with only a short break for sandwiches. Luckey said he remained home until 5:30 p. m., when his neighbor's husband came home from work. Luckey said he left home once for about seven to eight minutes to make a phone call at Cicero and Adams streets.

Luckey said he first saw Rodriguez, Carter and Carr at the lineup on February 16 and that he was never at the store which was robbed. Defendant was arrested at Madison and Pulaski while wearing a black Russian hat and a brown suede jacket. According to defendant, the police officer who arrested him said that the defendant fit a description the officer had and that the officer said, "You don't change clothes, do you?" He was then taken to a police station where he was placed in a lineup with four other people, all of whom were of similar build but defendant said he was the tallest by "half a head."

On cross-examination the State brought out that he was the brother-in-law of defendant Hannah, having married Hannah's sister. Luckey explained that when he said he was not a religious man, he meant that he didn't go to church on Sunday and that he learns what to do by reading to himself. Luckey said that while reading the Bible, he would stop periodically and explain passages which were not understood. The occupants of the apartment were also listening to a radio which was broadcasting a jazz program. Luckey said the radio was on all day. Defendant stated he left to make a phone call around twenty-five minutes before 9:00 a. m., on the morning of February 14. After the lineup was conducted, the defendant was asked by a detective about his shoes.

23

He told them he wore Stacey brand black shoes and he gave them to the detective. Luckey testified he had purchased the shoes a couple of weeks before his arrest in an unidentified store, near Maxwell Street. He said that the shoes were Stacey-Adams brand and that he told the police they were Stacey shoes.

The defendant's wife, Betty Luckey, who is defendant Hannah's sister, testified that on February 14, 1966, she was home sick and that she was five months pregnant at that time. She remained in her apartment the entire day with defendant and her neighbor, Regina Curry. Her husband left only once during the day, around 9:00 a. m. to call her employer and her neighbor's husband came home at 5:00 p. m. that evening. On cross-examination she maintained her husband made the phone call around 9:00 a. m. because she looked at a clock. She was positive that Mr. Curry came home a little after 5:00 p. m. Defendant's wife testified that she spent the entire day of February 14 with her husband and neighbor engaged in reading and discussing the Bible. The witness did not recall what she ate but stated her husband did have breakfast. She stated that around 4:00 p. m. that afternoon she and her husband went with Mrs. Curry to her apartment, where the latter fixed sandwiches. Mrs. Luckey said they listened to Mrs. Curry's radio in her neighbor's apartment. They listened to music and Mrs. Curry fed her child. The witness said she remained there only for fifteen minutes. She further testified that there was no radio in her apartment, nor did she listen to a radio in her home.

Mrs. Regina Curry, defendant Luckey's neighbor, testified that the defendant was in her presence the entire day of February 14, from 9:00 a. m. to 5:00 p. m. She related seeing the Luckeys in their apartment, and that her husband came home from work at approximately 5:30 that evening. The witness said that defendant

did leave his apartment around 9:00 a. m. and returned in about seven to ten minutes. Her time in the Luckey's apartment was spent reading the Bible and discussing various passages. Mrs. Curry said she went to her apartment across the hall at about 4:00 p. m. to fix some food for her daughter. All three individuals went to the Curry apartment and returned to the Luckey apartment in a short time. The witness mentioned that her two-year-old daughter was with her in the Luckey apartment. Mrs. Curry stated her radio was on in her apartment and was playing music. She remembered it was Valentine's Day because of the music played that day. Mrs. Curry said it was quiet in the Luckey apartment. The defense called Charles Curry who stated he saw defendant Luckey on February 14, at about 5:15 to 5:30 in the afternoon at Luckey's apartment. Upon his arrival, he joined the others in reading the Bible for about another hour or so.

Next, the defense called Hannah Israel, wife of the defendant Hannah. Her residence on February 14 was 1239 South Racine, in apartment 705 with her mother. She said she was with her husband from 9 o'clock in the morning to 7:30 the following evening, in apartment 608 at the above address. She arrived at that address with her husband from her mother-in-law's house at 1433 West 13th Street. Defendant and the witness went to apartment 608 at 1239 South Racine to baby-sit for a Mrs. Walker and remained there the entire day. Mrs. Walker left the apartment at about 10:00 a. m. to go to work. She testified that neither her husband nor she left the apartment on that date until about 7:30 Tuesday night, having slept there on Monday evening. The only other persons present during the daytime were the witness' son and Mrs. Walker's two sons. Mrs. Israel stated on cross-examination that she had baby-sat for Mrs. Walker before, having known her about four years.

25

She testified her husband did not work on the 14th but did work later that week. His employment was irregular, working for a dock company. The witness stated that she and her husband spent their time reading the Bible and discussing some things.

The defendant, Hannah, otherwise known as Judah Israel, testified in his own behalf. He stated that he accompanied his wife to Mrs. Walker's apartment at about 9:00 a. m. on February 14 to stay with his wife while she was baby-sitting. Defendant said he did not leave that apartment on the date in question and he remained there with his wife until the following evening. He stated he was employed as a stevedore for the Chicago Produce Cold Storage Company on an independent basis, working only part of the week. He did not work on February 14. The witness said he had a rather large mustache for about five years; that he had this mustache on February 14, 1966. Defendant Hannah's jail identification card with his photograph was admitted into evidence. Defendant maintained that he worked on Wednesday and Thursday of the week in question, but did not work on Friday. He said he and his wife found an apartment on that Friday and moved in the same day. The defendant's mustache had the same growth for about two to three years.

Following the closing arguments of counsel, the trial judge found the defendants guilty as charged. The trial judge commented that he was disregarding Rodriguez's testimony but stated the identification of the defendants was positive by both Carter and Carr. In doing so the trial court expressed doubt as to the creditability of the alibi evidence produced by the defense.

The defendants contend that this record discloses grave doubt concerning the identification of the defendants as the perpetrators of this armed robbery. As a corollary to this, defendants maintain that the trial

court erred in disregarding the alibi testimony presented as a defense to these charges. On the other hand, the State insists that the defendants' guilt was proved beyond a reasonable doubt, since that determination depended on the creditability of the witnesses which should not be disturbed on appeal. Furthermore, the State relies upon the rule that an identification by one witness of an accused is sufficient if that testimony is credible and positive. For the reasons set forth below, we agree with the State's position on this issue.

The defendants' brief discussed much of Rodriguez's testimony and emphasized the fact that the trial court stated that he was disregarding that witness's testimony. Defendants maintain that this fact strengthens the alibi defense and casts doubt upon the sufficiency of the State's evidence to prove the defendants' guilt beyond a reasonable doubt. The State does not question the trial judge's action in disregarding Rodriguez' testimony. However, the State disagrees with the defendants' assertions that this fact alone warrants a finding that reasonable doubt existed. On the contrary, the State asserts that the identification of defendants by Carter and Carr were positive and unshaken, so that the trial court was correct in its ruling.

Defendants have correctly asserted that none of the identification witnesses testified with regard to the defendant Hannah's mustache. The defendants have cited the cases of People v. Marshall, 74 Ill App2d 483, 221 NE2d 133 (1966) and People v. Martin, 95 Ill App2d 457, 238 NE2d 205 (1968), which dealt with a witness' failure to notice a mustache as a facial characteristic that would not have been overlooked. Thus, doubt was cast upon the certainty of the identification in those decisions. These cases relied upon the decision in People v. Kincy, 72 Ill App2d 419, 219 NE2d 662 (1966). In Kincy, a conviction for robbery was reversed due to the

fact that the identification of the accused by the complaining witness was based solely on the type of jacket worn by the alleged robber. Among the numerous discrepancies in evidence, the court pointed out that the failure of the complaining witness to notice the defendant's prominent mustache led the court to conclude that the identification was vague, doubtful and uncertain. These facts when coupled with an uncontradicted alibi prompted the court to hold that the accused's guilt was not proved beyond a reasonable doubt. The Marshall and Martin decisions are of similar import.

We are of the opinion that there are sufficient facts in the instant case to distinguish the above decisions and hold that they are inapplicable in this appeal. All of the cases relied upon by the defendants emphasized a witness' failure to take note of a mustache or to notice if an assailant had any such characteristic. However, there were other factors which further cast doubt on the identification testimony, i. e., discrepancies in height, build, type of clothing, etc. Furthermore, all of the defendants in those cases were identified by means other than a lineup. The distinctions are obvious.

In this case, the testimony of Carter and Carr was both believable and positive. Witness Carter described the clothing and build of each defendant. Carter picked out the defendants from separate lineups conducted on different days. Carter had ample opportunity to observe both the individuals who committed the robbery. As to Carr, he could only identify Luckey and very truthfully said he could not identify Hannah as the other man. With regard to the fact that Carter had not noted the presence of a mustache on Hannah, the record shows that no inquiry was made of this witness concerning whether he in fact noticed such a facial characteristic. The evidence regarding the mustache was introduced by

the defense through police officer Robbins who testified that Rodriguez described one of the robbers as having a mustache. Defendant Hannah then stated he had a mustache for about four or five years and had one on February 14, 1966.

■ The State has correctly relied upon the rule that where one witness' identification is positive and credible when based upon the circumstances of the case, then that witness' testimony is sufficient to convict, although that evidence is contradicted by the accused. People v. Brinkley, 33 Ill2d 403, 211 NE2d 730 (1965) ; People v. Keathley, 109 Ill App2d 323, 248 NE2d 782 (1969). During the occurrence, Carter had two distinct opportunities to observe Hannah and the fact that Carter helped show defendant Luckey a pair of shoes and that Luckey came back to the washroom to warn him not to move on three occasions, gave this witness ample opportunity to observe both defendants. Carr's testimony corroborates the identification of Luckey and the evidence showed he had ample opportunity to observe said defendant. The testimony of these identification witnesses was clear and unshaken. We could not characterize their testimony as ambiguous, vague or uncertain.

Defendants have emphasized that neither Carter nor Carr saw them taking money from the cash register on that date. Thus, they conclude that these witnesses could not testify to the crime of robbery. We cannot accept this position. Despite the fact that neither witness actually saw the money taken, we think the evidence adequately shows that they were present on the date the store in which they worked was robbed.

■ Finally, we come to the defendants' assertion that the defense alibi was proven by evidence which when considered with the identification testimony establishes that defendants' guilt was not proved beyond a reason-

able doubt. According to the case of People v. Gooden, 403 Ill 455, 86 NE2d 198 (1949), at page 461:

"Evidence of an alibi cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime charged, and while the identification and whereabouts of the defendant when the crime was committed are questions for the jury, yet where, from the entire record, there is a reasonable doubt of the guilt of the defendant because of the uncertainty of identification, the conviction cannot stand. . . . It is well settled that where there is evidence fairly tending to establish an alibi such evidence cannot be disregarded where the only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime."

This rule applies to bench trials. Defendants argue that the judge in their case violated this principle by disregarding the alibis of these defendants. We find no merit in that contention.

 The record discloses that the identification of these men was positive. Furthermore, the alibi testimony was inconsistent and mainly introduced by persons who were relatives of the defendants. For example, as to Luckey's alibi, there were discrepancies as to the time of certain events, the testimony regarding the radio and who was present in the Luckey apartment. As to Hannah's alibi, the fact that defendant and his wife remained for almost thirty-six hours in an apartment when their own residence was only on the next floor casts some doubt on the credibility of that defense. A reviewing court will not lightly disturb a trial judge's decision as to the credibility of witnesses. People v. White, 63 Ill App2d 105, 211 NE2d 9 (1965). Thus, it is apparent that the rule of the Gooden case, supra, has no applica-

bility to this case. The evidence overwhelmingly proved the defendants' guilt beyond a reasonable doubt.

The defendants' convictions are affirmed.

Judgments affirmed.

BURMAN, P. J. and MURPHY, J., concur.