**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 170747-U

Order filed December 13, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0747 Circuit No. 17-CF-24 |
| QUINTARIUS D. REYNOLDS, | ) ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Carter and Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) The State proved the defendant guilty beyond a reasonable doubt; (2) the trial court did not abuse its discretion by refusing the defendant's proposed accountability instruction; and (3) the trial court did not abuse its discretion by delivering pattern jury instruction regarding operability of a firearm.

¶ 2    The defendant, Quintarius D. Reynolds, appeals following his conviction for aggravated battery, attempted armed robbery, and unlawful possession of a firearm. He argues that the State failed to prove him guilty beyond a reasonable doubt because the identifications made by two

witnesses at trial were each unreliable. He also argues that the trial court committed multiple errors relating to jury instructions.

¶ 3                                        I. BACKGROUND

¶ 4        The State charged the defendant via indictment with aggravated battery (720 ILCS 5/12-3.-5(e)(1) (West 2016)), attempted armed robbery (*id.* §§ 8-4(a), 18-2(a)), and unlawful possession of a firearm (*id.* § 24-3.1(a)(2)). Count I, which charged the defendant and codefendant Aubrey Franklin with aggravated battery, alleged that they caused an injury to Jessie Tantillo by shooting him with a handgun. Count II, which charged the defendant and Franklin with attempted armed robbery, alleged that they demanded money from Scott Emmer while threatening the imminent use of force.

¶ 5        At trial, Emmer testified that on December 29, 2016, he discovered an all-terrain vehicle (ATV) for sale on Facebook. Emmer sent a message to the seller through Facebook, and they arranged to meet at 7 p.m. in Peoria. Emmer drove to Peoria with his son, Tantillo. He testified that it was dark outside when they arrived.

¶ 6        When Emmer arrived in front of the house he sent a message through Facebook to let the seller know he had arrived. Later, a "shorter gentleman" approached Emmer's truck. Emmer described the man as short, African American, and wearing a hooded sweatshirt with the hood pulled up. Emmer and Tantillo exited the truck, at which point the shorter man told them that the ATV "was around back."

¶ 7        Emmer and Tantillo walked to the backyard, but Emmer did not see an ATV. Emmer testified: "A gentleman who was taller ran around the back of the house with a gun. *** He said, 'Give me your money,' but we took off running." Emmer testified that he struggled with the taller man "for a moment" in the vicinity of his truck. Emmer tried to hold onto the gun to

2

"ke[ep] it out of [his] face." Emmer testified that he was "[f]ace-to-face" with the taller man during the struggle. Emmer heard gunshots coming from somewhere else while he struggled with the taller man. Emmer testified that he eventually took the taller man to the ground. The taller man then "started shooting," so Emmer tried to run to the other side of his truck. Emmer did not know where Tantillo was at that point, so he yelled for him. Tantillo emerged from between two houses across the road. He had been shot in the leg.

¶ 8        Emmer testified that eventually the two assailants ran away. Emmer went to a friend's house to call for help, then took Tantillo to the emergency room.

¶ 9        When asked if he would recognize the taller man with the gun if he saw him again, Emmer responded affirmatively. He then identified the defendant as the taller man. Defense counsel asked that the record to reflect that the defendant was "the only black male of about 20 years old seated in the entire courtroom."

¶ 10        Five days after the incident, Emmer saw the same ATV listed for sale, this time on Craigslist. Emmer informed the police, who instructed him to arrange another meeting with the seller of the ATV. Emmer set up the meeting, but did not actually meet the seller, because the police told him "they would take care of it." The meeting was arranged at a different location from the one at which Emmer and Tantillo had been accosted.

¶ 11        On cross-examination, Emmer agreed that he had told the police that "everything happened so fast" and that he would not be able to identify his assailant. Emmer testified that the entire incident lasted "[j]ust a couple minutes." He estimated that the distance from his truck to the back of the house had been approximately 35 feet. Emmer testified that the struggle with the taller man actually began in the backyard, and that Emmer "carried him from the backyard all the way to [the] front on my back with a gun in my face."

3

¶ 12    On redirect, Emmer explained that the police initially showed him a series of dark photographs, and he was uncomfortable trying to identify his assailant based on pictures he could not see that well. Emmer also identified People's exhibit No. 12 as the gun carried by the taller man, the defendant, during their struggle. Emmer specifically recalled that the gun was semiautomatic with a shiny or chrome top.

¶ 13    Tantillo testified that he accompanied Emmer to purchase an ATV in Peoria. He described the first person they met as four inches shorter and 20 pounds lighter than himself, an African American man with some facial hair and a hooded sweatshirt with the hood pulled up. Tantillo testified that he (Tantillo) "made it a point to look at his face." Tantillo and Emmer went to the backyard, at which point a man Tantillo identified in court as the defendant ran out holding a gun and demanding their money.

¶ 14    Tantillo testified that he and Emmer "took off running" for the truck. He saw that both men had Emmer pinned against the truck, so Tantillo grabbed the shorter man. Tantillo testified that both men were holding guns. Tantillo tried to disarm the shorter man but was unsuccessful. The shorter man shot at him four or five times. Tantillo was able to flee and hid between two houses. He emerged when Emmer yelled for him. Tantillo identified People's exhibit No. 13 as the gun he was shot with. After the incident, Tantillo was shown a photographic lineup as well as an in-person lineup. From the in-person lineup, Tantillo identified the defendant.

¶ 15    On cross-examination, Tantillo testified that he could not remember the exact time that he and Emmer arrived in Peoria. He estimated that it could have been between 12 and 2 a.m. Tantillo further estimated that the walk from the truck to the backyard was 80 feet, and that the entire incident lasted about an hour.

¶ 16    Tantillo also clarified that he was shown the photographic lineup by police on a separate, earlier day than when he was shown the in-person lineup. He was shown the photographic lineup within two weeks of the incident and did not identify anybody from that lineup. He told the officer showing him the photographic lineup that he thought a man named Kilo Gregory was involved in the incident. The in-person lineup occurred approximately a week later. Tantillo identified the defendant immediately. He thought that Franklin would be in the lineup as well, so he identified a second person in the lineup as the shorter assailant.

¶ 17    On redirect, Tantillo explained the photographic lineup was composed of black-and-white pictures, which lacked detail. He was not shown a photograph of the defendant in the photographic lineup.

¶ 18    Peoria police officer Brett Lawrence testified that he received a phone call from Emmer on January 3, 2017. Emmer notified him that he had reported the attempted robbery, and that the same ATV from that incident was again listed for sale online. Lawrence directed Emmer to arrange a transaction for the following day. Lawrence subsequently set up a surveillance team at 1530 Kneer Avenue, the location that Emmer had arranged.

¶ 19    Lawrence and another officer subsequently posed as the buyers of the ATV. Upon arriving at the location, Lawrence sent a text message to the seller from Emmer's phone. The defendant then walked down a driveway and directed Lawrence to drive his vehicle into an adjacent alley. Lawrence then advised two teams of officers to converge on the front and back of the house. Lawrence observed Franklin exit through a fence and begin walking south down the alley. Later, inside the house, Lawrence encountered the defendant as well as a man named Terrance Stone. Two ATVs were found in the backyard of the house.

¶ 20    David Buss of the Peoria Police Department testified that he participated in the search of 1530 Kneer Avenue. He discovered the firearms that were subsequently entered into evidence as People's exhibit Nos. 12 and 13. Both guns were semiautomatic. Buss later discovered that the gun that was People's exhibit No. 12 was not in firing condition because the firing pin had been removed. Buss was unable to collect usable fingerprint evidence from either of the weapons.

¶ 21    Nicholas Mason of the Peoria Police Department participated in the surveillance at 1530 Kneer Avenue. He testified that prior to Lawrence's arrival, he observed the defendant and another male enter the backyard of the house through a hole in the fence. After Mason was notified that the deal was about to commence, he observed one male crouching behind a fence while the defendant stood behind a tree in the backyard. The defendant eventually went around to the front of the house and made contact with Lawrence.

¶ 22    At the jury instruction conference, defense counsel objected to the Illinois Pattern Jury Instructions, Criminal No. 5.03 (approved July 18, 2014) (hereinafter IPI Criminal No. 5.03), which set forth the law relating to accountability. Instead, counsel sought to offer his own modified instruction, which would add the following addition sentence: "Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." The State objected, arguing that where a pattern instruction is available it must be given. Defense counsel argued that his modified version of the instruction was more accurate. The court refused to give the defense instruction.

¶ 23    Defense counsel also objected to IPI Criminal No. 18.07A. That instruction stated: "The word 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas.

6

Whether a firearm is operable does not affect its status as a weapon." The court overruled the objection and allowed the instruction.

¶ 24    In closing arguments, defense counsel urged the jury that the identifications made by Emmer and Tantillo were unreliable, and that the State had thus failed to establish that the defendant was one of the attackers. Alternatively, counsel argued that even if the defendant was present at the time of the incident, he was only carrying an inoperable firearm and should not be held accountable for the shorter assailant's shooting of Tantillo.

¶ 25    The jury found the defendant guilty on all three charges. The court sentenced the defendant to a term of 18 years' imprisonment for aggravated battery, with terms of 4 years and 1 year for attempted armed robbery and unlawful possession of a firearm, respectively, to be served concurrently.

¶ 26                                  II. ANALYSIS

¶ 27    On appeal, the defendant argues that the identification testimony of Emmer and Tantillo was "unreliable and contradictory." As a result, he argues, the State failed to prove him guilty beyond a reasonable doubt. The defendant also contends the court erred by declining to deliver his modified version of IPI Criminal No. 5.03 on accountability and by delivering IPI Criminal 18.07A, the definition of the term "firearm."

¶ 28                          A. Sufficiency of the Evidence

¶ 29    The defendant first argues that neither Emmer nor Tantillo "viewed the Defendant under circumstances permitting a positive identification." Additionally, he asserts that the testimony of Emmer and Tantillo was further undermined by their contradictory nature as to certain facts relating to the incident on December 29, 2016. The defendant concludes that because the

7

testimony of the State's two primary witnesses was so unreliable, no reasonable jury could have found the defendant guilty beyond a reasonable doubt.

¶ 30    When a challenge is made to the sufficiency of the evidence at trial, we review to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31; *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In making this determination, we review the evidence in the light most favorable to the prosecution. *Baskerville*, 2012 IL 111056, ¶ 31. All reasonable inferences from the record in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 327 (2005). The relevant question is whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. See *People v. Pintos*, 133 Ill. 2d 286, 292 (1989).

¶ 31    It is not the purpose of a reviewing court to retry a defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Instead, great deference is given to the trier of fact. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416-17 (2007). Resolution of any conflicts or inconsistencies in the evidence is the responsibility of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 32    In *People v. Slim*, 127 Ill. 2d 302, 307 (1989), our supreme court held that "[a]n identification will not be deemed sufficient to support a conviction if it is vague or doubtful. [Citations.] A single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." The *Slim* court further listed five circumstances to be considered in evaluating an identification:

> "(1) the opportunity the victim had to view the criminal at the time of the crime;
>
> (2) the witness' degree of attention; (3) the accuracy of the witness' prior

8

description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Id.* at 308.

¶ 33 The reliability of an identification is a question for the fact finder. *People v. Corral*, 2019 IL App (1st) 171501, ¶¶ 81-82. "Normally, the jury decides the weight that an identification deserves, and the less reliable the jury finds the identification to be, the less weight the jury will give it." *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008). To that end, IPI Criminal No. 3.15 instructs the jury that the five *Slim* factors should be considered when weighing identification testimony. IPI Criminal No. 3.15. Thus, like any other determination within the province of the jury, we will only disturb a conclusion with respect to witness identification where no reasonable jury, considering the *Slim* factors, would find such an identification reliable.

¶ 34 Both Emmer and Tantillo testified with certainty at trial that the defendant was the taller of their two assailants, the one who emerged in the backyard holding a gun. Tantillo had previously identified the defendant as the taller of the assailants at an in-person lineup three weeks after the incident. Emmer had an up-close view of the defendant as they engaged in a hand-to-hand struggle. Tantillo saw both men up-close when he saw them fighting with Emmer by the truck.

¶ 35 Other of the *Slim* factors point in multiple directions. For example, the defendant asserts on appeal that both Emmer and Tantillo suffered from a reduced "degree of attention" in part because they were highly terrified and excited by the situation. But a jury could have just as reasonably construed those facts in favor of the identifications, on the grounds that the nature of the situation would have heightened Emmer's and Tantillo's awareness, and that they were hyper-focused on their assailants. Additionally, while the evidence clearly established that it was

dark outside at the time of the incident, there was plainly enough light for both Emmer and Tantillo to provide significant details of the attack.

¶ 36    Further, neither Emmer nor Tantillo provided significant descriptive details of the defendant, other than that he was a tall, African American male. Still, while the relative dearth of details weighs against the reliability of the identifications, they cannot be considered as damning as a discrepancy or variance in the providing of details. See *Slim*, 127 Ill. 2d at 308 ("[I]t can be said that discrepancies and omissions as to facial and other physical characteristics are not fatal, but simply affect the weight to be given the identification testimony."). Similarly, while Tantillo's identification of the defendant in the line-up is undermined by his failed attempt to identify the second assailant as well, it cannot be said to fully negate that initial, correct identification.

¶ 37    The defendant also argues that the identifications were undermined by the contradictory nature of Emmer's and Tantillo's testimony. He points out that Emmer testified that they arrived in Peoria at 7 p.m. while Tantillo believed it was after midnight. Emmer estimated the distance from the truck to the backyard to be 35 feet, while Tantillo estimated 80 feet. Finally, Emmer testified that the entire incident lasted two minutes while Tantillo believed it was at least an hour. While these pieces of testimony are contradictory, none of them involve particularly salient details of the case. Emmer's and Tantillo's testimony, on the whole and regarding the important events, were largely consistent with one another. The distance from Emmer's truck to the backyard or the precise time of night at which the attack happened are not especially relevant, and differences in estimation on such points can not be said to have significantly hindered the witnesses' credibility in the eyes of the jury.

10

¶ 38    In any event, the most important factor in favor of the identifications in this case was one discussed in *Slim*, but not included in the formal list of factors: corroborative evidence. In *Slim*, a witness identified the defendant as the man who stole his car. *Id.* at 305. The defendant was subsequently arrested 90 miles away from the scene of the crime, while riding in the witness' car. *Id.* The *Slim* court pointed out that the witness' identification was "convincingly corroborated," and rejected the defendant's argument. *Id.* at 315. The court distinguished cases in which there had been no corroboration, and the verdict rested on the identification alone. *Id.* (citing *People v. Byas*, 117 Ill. App. 3d 979 (1983); *People v. Gardner*, 35 Ill. 2d 564 (1966); and *People v. Gooden*, 403 Ill. 455 (1949)). The court also cited with approval cases in which courts had rejected similar arguments because of the presence of corroborating evidence. *Id.* at 314 (citing *People v. Johnson*, 114 Ill. 2d 170 (1986); *People v. Bias*, 131 Ill. App. 3d 98 (1985); and *People v. Moore*, 50 Ill. App. 3d 952 (1977)).

¶ 39    On a fundamental level, the identifications made by Emmer and Tantillo were each corroborative of the other. It is less likely that two independent identifications are both incorrect than if there had been just one. Indeed, the defendant has failed to cite a case in which a court has deemed *two* witness identifications to *both* be fatally unreliable.

¶ 40    More importantly, the identifications are corroborated by the other evidence against the defendant. Days after the incident, Emmer noticed the same ATV for sale online and notified police. After an undercover buy was arranged, multiple Peoria police officers observed the defendant at the house where the transaction was to take place. Mason testified that the defendant and another male were acting furtively in anticipation of the buyer's arrival.

11

¶ 41     The defendant makes no argument regarding this corroborating evidence. In fact, he omits entirely from the fact section of his brief an explanation of Emmer's discovery of the second sale of the ATV or the defendant's subsequent presence at the arranged undercover buy.

¶ 42     While application of the formal *Slim* factors is perhaps ambivalent, the identifications made by Emmer and Tantillo were "convincingly corroborated" by the other evidence presented in the case. *Id.* at 315. Given this evidence, we cannot conclude that no rational trier of fact could have found those identifications reliable, and we cannot conclude that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Baskerville*, 2012 IL 111056, ¶ 31.

¶ 43                         B. The Defendant's Proposed Jury Instruction

¶ 44     IPI Criminal No. 5.03 instructs the jury:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of [(an) (the)] offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of [(an) (the)] offense."

In addition to this pattern instruction, the defendant requested that the trial court include the following language: "Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." The court denied the request, and the defendant assigns error.

¶ 45     We review the trial court's decision to not issue a jury instruction under the abuse of discretion standard. *People v. Garcia*, 165 Ill. 2d 409, 432 (1995). An abuse of discretion will be

12

found only where the instructions are unclear or misleading, or they fail to fairly and accurately state the law. *People v. Grant*, 2016 IL App (5th) 130416-B, ¶ 29. Even "[v]ery slight evidence" on a given theory in a case will justify the giving of an instruction on that theory in a criminal prosecution. *People v. Cookson*, 108 Ill. App. 3d 861, 865 (1982).

¶ 46    The defendant was not entitled to his "mere presence" instruction because there was no evidence at trial that the defendant was merely present at the scene of the attack. Both Emmer and Tantillo testified explicitly that the defendant was an active participant in the scheme to rob them at gunpoint. This testimony was corroborated by officers who testified that the defendant later played a role in the undercover buy. Both Emmer and Tantillo testified that the defendant held a gun and demanded their money. Emmer testified that the defendant shot at him. In short, there was no evidence that the defendant was simply an innocent bystander while the shorter man robbed Emmer and Tantillo.

¶ 47    Indeed, the delivery of the "mere presence" instruction would have been particularly misleading to the jury in this case, given the theory that defense counsel presented at closing argument. Counsel argued that the defendant should not be accountable for the shorter assailant's actions because the defendant was carrying a gun that was inoperable. Even if it is accepted that the defendant carried an inoperable gun, such a fact would not absolve him of accountability, where the evidence plainly showed that he and the other assailant had a common design. An inoperable firearm is not the equivalent of "mere presence" at the scene. Accordingly, we find that the trial court did not abuse its discretion in denying the defendant's proposed instruction.

¶ 48    C. IPI Criminal No. 18.07A

¶ 49    IPI Criminal No. 18.07A instructs the jury:

13

"The word 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas. ***

[Whether a firearm is operable does not affect its status as a weapon.]"

The court in this case delivered this instruction to the jury, including the bracketed portion relating to the operability of the firearm.

¶ 50    The defendant argues that the court abused its discretion by delivering the instruction regarding the operability of the firearm. He contends that a gun "could conceivably be in such a state of disrepair or its design so completely altered that it no longer could be said to be 'designed' for that purpose." He argues that in this case, the firearm that was missing its firing pin was inoperable to the extent that it was no longer a firearm.

¶ 51    It is well-settled that the lack of operability of a firearm does not affect its status as a firearm for unlawful possession purposes. *People v. White*, 253 Ill. App. 3d 1097, 1098 (1993) ("[I]t is sufficient to support a conviction that the object possessed the outward appearance and characteristics of a firearm, even if inoperable."); *People v. Hester*, 271 Ill. App. 3d 954, 956-57 (1995) (finding no error in trial court's delivery of operability instruction); *People v. Hughes*, 123 Ill. App. 2d 115, 122 (1970) ("[I]t was not necessary for the State to prove that the instrument was in an operable condition.").

¶ 52    The only cases the defendant relies upon in support of his contention on appeal concern the unlawful *use* of a weapon statute (720 ILCS 5/24-1 (West 2016)). See *People v. Williams*, 394 Ill. App. 3d 286 (2009); *People v. Velez*, 336 Ill. App. 3d 261 (2003); *People v. Coburn*, 25 Ill. App. 3d 542 (1975). That statute contains multiple exceptions for firearms that "are broken down in a non-functioning state." 720 ILCS 5/24-1(a)(4)(i), (a)(10(i) (West 2016). The unlawful

14

possession statute, under which the defendant was charged, contains no such caveats. See *id.* § 24-3.1. Indeed, in the committee comments accompanying IPI Criminal No. 18.07A, the committee explicitly stated that the instruction is intended only for unlawful *possession* of a weapon, adding: "Do not use this instruction with offenses arising under 720 ILCS 5/24-1." IPI Criminal No. 18.07A.

¶ 53        Because the operability of the firearm is not an element of unlawful possession of a weapon, the court provided a fair and accurate statement of the law to the jury in the present case. We find no abuse of discretion.

¶ 54                                    III. CONCLUSION

¶ 55        The judgment of the circuit court of Peoria County is affirmed.

¶ 56        Affirmed.