(No. 23429.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARVEY BUCHHOLZ, Plaintiff in Error.

*Opinion filed April 24, 1936.*

JAMES M. BURKE, and GEORGE M. CRANE, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, and RICHARD H. DEVINE, of counsel,) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Harvey Buchholz, was indicted in the criminal court of Cook county for the crime of robbery. He waived a trial by jury, the court found him guilty and sentenced him to imprisonment in the penitentiary. To obtain a reversal of the judgment of conviction the defendant prosecutes this writ of error. He assigns and argues the single error that the evidence fails to establish his guilt beyond a reasonable doubt. The determination of this issue necessitates a review of the evidence.

Antoinette O'Nesta, the prosecuting witness, resides at 3631 North Hermitage avenue in Chicago. Her home is on a lot north of, and contiguous to, a vacant lot on the east side of the street. She testified that on the night of July 1, 1935, she visited at the house of a friend until 11:45 P.M.; that as she walked by the vacant lot on her way home a man suddenly appeared; that he had his right hand in his pocket pointed up and threatened violence unless she raised her hands; that as she obeyed his command the stranger seized her purse, turned her around and marched her south to an alley in the same block. Addison street, extending east and west, intersects with Hermitage avenue and is the first thoroughfare south of the alley. Miss O'Nesta stated that although there is a street light at the intersection and another lamp on the west side of the street, directly across from the alley, heavy foliage on the large number of trees made it quite dark at the time she was accosted. The witness testified further that when they arrived at the alley the man told her not to move, to refrain from making any noise and threatened to kill her; that when half-way in the alley he examined her purse, found only fifteen cents and upon ascertaining that it was all the money in her possession, laughed and returned the purse and its contents to her. The complaining witness testified that the robber thereupon proceeded to become indecently familiar with her, made repulsive proposals and committed certain lascivious

acts in her presence, all of which she narrated with particularity. From her testimony it appears that they then walked down the alley and when they reached the sidewalk he asked her where she lived; that she informed him and he then escorted her to the door of her home; that while accompanying her home the robber expressed the desire to take her out and make amends for his conduct; that he gave her his telephone number and told her that his given name was Harvey; that she wrote both the number and the name on the cover of a paper match package with her eyebrow pencil, and that he informed her she could get in touch with him by calling him between eight and nine o'clock any evening except Thursday. The match cover was introduced in evidence. It bears the notation, "Graceland 2314 Harvey." According to the witness the robber then took his departure and she went into the house; that she did not, however, inform her mother of the occurrence as the latter had not been feeling well and was asleep. She fixed the time of her arrival home at exactly 12:20 A.M. on July 2. So far as the record discloses Miss O'Nesta informed no one of the alleged robbery or the depraved conduct of the robber until eight o'clock in the evening of July 2. At the time stated, she testified that in the presence of Dudley Meehle, a friend, also known as "Bud," she called the number on the match cover and asked to speak to "Harvey;" that she recognized the voice of the man called to the telephone as that of the robber, informed him "Annette" was calling and described herself as "the girl you held up and tried to attack last night;" that the man answered, "Oh yes, yes, I know now;" that Meehle took the telephone from her and talked to the man but that she did not hear or know what he said. She and Meehle went to the police station where the home address of the defendant was ascertained through the telephone number. They then accompanied two police officers in an automobile to the defendant's residence where the officers

arrested the defendant. Miss O'Nesta testified that she did not say anything to him when he was placed in the car. She stated positively that she had never seen him prior to the robbery.

The only other witness called by the prosecution was Patrick O'Malley, a police officer. He testified that when he arrested the defendant he directed him to dress as he was dressed the previous night and that the defendant promptly complied with the request. He did not inform the defendant what the charge was against him.

Charlotte Nelson testified in behalf of the defendant. She stated that she had been acquainted with him for five years during which time she had seen him four or five times every week. This witness formerly resided at 3042 Clifton avenue and at that time Miss O'Nesta lived a half-block from her. Charlotte testified that she knew Yolanda O'Nesta, a sister of the complaining witness. From Miss Nelson's testimony it appears that she and the defendant were present in a tavern known as the Famous Cafe on a Saturday night in May, 1935. She testified that Antoinette O'Nesta and Meehle were also present at the tavern on this occasion and that for three hours they occupied a table next to the witness and the defendant; that Antoinette observed them the entire evening; that she, likewise, watched Antoinette and Meehle, and that she, the witness, was particularly impressed by the fact that they danced well. Antoinette admitted that she and Meehle were present at the tavern on the occasion mentioned but denied seeing either the defendant or Charlotte Nelson there. She added that she had seen Charlotte when she resided at her former address but did not have a speaking acquaintance with her.

The defendant testified in his own behalf. He stated that he saw the prosecuting witness at the tavern in May, 1935, and that this was the first and only time he ever saw her prior to July 2 when she confronted him at the detective bureau. The defendant stated that he noticed her and

Meehle on that occasion because of the fact that they were excellent dancers. On July 1, 1935, and at the time of the trial, the defendant was twenty-one years of age, employed as an apprentice painter and resided with his parents at 3013 North Ashland avenue, one mile distant from the home of the prosecuting witness and, also, from the scene of the robbery. His testimony shows that he attended Lane Technical High School three and one-half years and thereafter night school at the Lake View High School; that with the exception of about six months he had been continuously employed since the spring of 1930; that in May, 1935, he entered the employ of Charles E. Drobs, a painting contractor; that he worked ten hours each day, and that he earned $22 during the week immediately preceding his arrest. He denied that he was in the neighborhood of Hermitage avenue and Addison street on the night of the robbery and denied that he perpetrated or had knowledge of the robbery. The evidence discloses that on Monday, July 1, 1935, he worked all day and that after his evening meal he remained at home until about 7:00 P.M. The defendant testified that he returned about 9:00 or 9:30 P.M., accompanied by some boys, and that they repaired to his father's garage to examine an automobile; that he and his companions remained there ten or fifteen minutes; that they then went to a Jack & Jill ice cream shop at 3068 North Lincoln avenue where he, together with a large group, listened to a radio broadcast of an important night baseball game; that he remained at this store until 10:45 when Lucille Deich, an employee, completed her duties; that he accompanied her to another Jack & Jill store located at the triple intersection of Lincoln and Damen avenues with Irving Park Boulevard where she had an appointment with a friend employed there; that her friend was not there and that he then escorted Miss Deich across the street and waited until she boarded a Lincoln avenue street car. According to the defendant it was then about 11:30, but not

later than 11:40 P.M., and he immediately proceeded home by walking on the west side of Lincoln avenue to its intersection with Ashland avenue, crossed to the east side of that street and continued south until he arrived home; that the route he followed was the shortest way home from Lincoln avenue and Irving Park Boulevard and that the time taken did not exceed twenty-five minutes. He stated that when he entered the house both his parents questioned him with respect to the time; that he answered it was about twelve o'clock, went into the kitchen and had some coffee, and that he then went upstairs to the third floor to the bedroom which he and his brother shared.

The following day, July 2, the defendant worked as usual. From his testimony it appears that after dinner he worked on his car until called to the telephone by his sister who informed him that "Charlotte" wished to speak with him. The defendant specifically denied the account of this telephone conversation as related by Miss O'Nesta, and, particularly, the statements which she attributed to him. He testified that upon answering the call, some one announced, "This is Annette;" that in response to his query, the name was repeated in a mumbling tone; that he next heard a man's voice cursing him and threatening to make it tough for him, and that he thereupon hung up. The defendant resumed his work in the garage, later went to the Burley playground and returned home shortly thereafter. He stated that a few minutes later a police officer appeared and directed him to put on the clothes he wore the previous night and to accompany him; that he saw some one sitting in the back of the car to which he was taken but that he did not recognize the individual. The defendant stated that although he saw Miss O'Nesta at the police station he did not recognize her until he saw Meehle who he observed was the man he and Charlotte Nelson had seen at the Famous Cafe. He added that she, Antoinette, made a statement in the office of one of the detectives and pointed

him out as the man who robbed her; that he denied her accusation; that on this occasion, and again at the preliminary hearing, she said the robbery occurred about 12:30 or 12:45 A.M. on July 2. The defendant, his father and his mother, each testified that he had never been arrested before.

Lucille Deich, the young woman employed at the Jack & Jill ice cream shop, corroborated the defendant's testimony with respect to his presence in the store at the time fixed by him and his whereabouts thereafter until 11:30 P. M. The witness fixed the day as July 1 because she kept a diary and resorted to it for the purpose of verifying the day in question when asked to testify.

The defense of alibi interposed by the defendant was supported by the testimony of four witnesses. William Kruse, who resides next door to the defendant, testified that he saw him early in the evening of July 1 between 6:00 and 7:00 P. M. and again about five minutes to twelve when he saw him coming from the north; that he, Kruse, remained outside a short time and, when he entered his house, set his alarm clock at 12:05 A. M. George Buchholz, employed by the board of education as a playground attendant, and his wife,—father and mother of the defendant,—testified that their son left the house the early part of the evening, returned later to examine a partly wrecked automobile in the family garage, and that they next saw him a few minutes before midnight when he returned the second time. Buchholz stated that the family had a rule requiring the children to be in the house before twelve o'clock. He added that he knew of no special occasion to warrant his son remaining out later than 12:00 o'clock on July 1. Roy Buchholz, younger brother of the defendant, testified that he awoke when Harvey came in the house on July 1; that a view of the large clock on the steeple of St. Alphonsus church could be obtained from the window of their room; that the dial or face of this clock remains

lighted only until 12:00 o'clock; that when Harvey returned home he looked at the clock and observed that it was still lighted. On cross-examination Roy also said that the church bells chime at 12:00 o'clock and that he heard the bells ring a couple of minutes after Harvey came home.

Four witnesses, including Charlotte Nelson, testified that they were acquainted with the reputation of the defendant in the neighborhood where he resided for honesty, integrity, chastity and morality and that his reputation was good. Other witnesses were Mrs. Lillian Stern, a neighbor who had known the defendant for seventeen years; Anthony Bahusky, a playground instructor, who had known the defendant for nine years, and Charles E. Drobs, the defendant's employer, who stated that he had known the defendant for more than two years. The evidence shows that the last witness became acquainted with the defendant while both were employed by an ice cream company.

The testimony of the prosecuting witness that the defendant, unarmed, robbed her and engaged in conduct too wanton to describe in this opinion, then accompanied her to the door of her home, gave her his correct name and telephone number and requested her to communicate with him is, to say the least, unconvincing. She made no complaint of the robbery and made no attempt to ascertain the address of the robber from the telephone number on the match cover during the interval between the alleged robbery and 9:00 P. M. on July 2. Her manifest indifference both to the robbery and to the depraved behavior of the robber, which she exhibited preceding the visit of her friend Meehle, tends to impair her testimony. The notation on the match cover was written by the complaining witness and in no manner corroborates her account of the alleged robbery. The testimony of Antoinette O'Nesta, to the effect that she had never seen the defendant prior to the commission of the crime which she charged to him, was contradicted not only by the defendant but also by Charlotte Nelson, both

of whom testified that they saw her and her friend "Bud" Meehle in a tavern in May, 1935. It is conceded that Miss O'Nesta and "Bud" were there on that occasion. On the other hand, the defendant offered a reasonably satisfactory account of his whereabouts during the entire evening of July 1, and, in particular, during the time the offense was committed. He was corroborated by five witnesses whose positive testimony that they saw the defendant prior to and during the perpetration of the robbery was in no manner impeached by the prosecution. Furthermore, there is uncontested evidence that the defendant had never been arrested prior to his apprehension in this cause and that he bore a good reputation as a law-abiding and peaceable citizen in the neighborhood in which he resided.

The burden rests upon the People not only to prove, beyond a reasonable doubt, the commission of the crime charged but also to establish by the same degree of proof the perpetration of the crime by the person accused. (*People* v. *Gold,* 361 Ill. 23; *People* v. *Peck,* 358 id. 642.) While evidence of good reputation is not proof of innocence it is not to be disregarded, and it may be sufficient to raise a reasonable doubt as to defendant's guilt. In the present case the defendant's good reputation stands uncontroverted and must be accorded some consideration and weight. Similarly, the evidence of alibi should not be disregarded where the only evidence contradicting it rests upon the identification of the defendant as the perpetrator of the crime. (*People* v. *Gold, supra; People* v. *Peck, supra; People* v. *DeSuno,* 354 Ill. 387.) Although the identification and whereabouts of the defendant at the time a crime is committed are questions for the trial court, where a cause is tried by the court without a jury, yet if a consideration of all the evidence raises a reasonable doubt of the guilt of the defendant the judgment should be reversed and the cause remanded for a new trial. *People* v. *Semenick,* 360

Ill. 250; *People* v. *Burr,* 356 id. 452; *People* v. *Grove,* 356 id. 246; *People* v. *DeSuno, supra.*

The judgment of the criminal court is reversed and the cause is remanded to that court.

*Reversed and remanded.*