(No. 34604.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* A. J. COULSON *et al.*, Plaintiffs in Error.

*Opinion filed March 20, 1958.*

SCHAEFER, J., took no part.

JAMES M. GOFF, and ROLAND D. WHITMAN, both of Chicago, for plaintiffs in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, WILLIAM H. SOUTH, FRANCIS X. RILEY, and JOHN J. STAMOS, of counsel,) for the People.

Mr. CHIEF JUSTICE DAVIS delivered the opinion of the Court:

A. J. Coulson and Joe Wise, defendants, together with Willie Beasley, were convicted of armed robbery by a jury in the criminal court of Cook County. The indictment contained two counts, charging them with robbery and armed robbery. They were represented at the trial by the public defender and their post-trial motions were overruled. Coulson and Wise were each sentenced to imprisonment in the penitentiary for not less than 5 nor more than 10 years, and Beasley for 1 to 5 years. By this writ of error, the defendants, Coulson and Wise, seek to reverse the judg-

ment of conviction. They here contended that the evidence did not establish their guilt beyond a reasonable doubt; that errors were committed in the admission of evidence; and that the jury was improperly instructed.

James Bailey, victim of the alleged robbery, Florina Parrish, an aunt with whom he lived at 1945 West Adams Street in the City of Chicago, Eugene Headtke, one of the arresting police officers, and Albert Dhooghe, a detective at the Warren Avenue police station, were witnesses for the People. At the time of the trial, Bailey was serving a jail sentence for striking a man on the head with a pistol. He testified that on July 8, 1955, he left work at 4:30 P.M. and went to the home of a fellow employee on West Diversey Avenue, six or seven blocks from Pulaski Avenue; that he remained there until 9 or 9:30 P.M. during which time he had "a couple of beers"; that he had about $87 in cash in his wallet when he quit work, and during the evening cashed a $110 paycheck which he had received that day; that upon leaving his friend's home, he walked to the corner of Diversey and Pulaski, boarded a bus and rode south to Madison Street and east on that street to its intersection with a cross street which may have been either 2200 or 2300 west; and that he there got off the bus and entered a corner tavern at about 10:50 P.M. He denied that he entered any other taverns en route home, but admitted that the trip from his friend's home to the tavern in question, a distance of about six miles traveled almost entirely by bus, had taken about an hour and a half, and that he had "maybe two shots of whiskey" during the evening. He stated that he remained in this tavern about ten minutes, and that when he left there at about 11:00 P.M. he had $197 on his person. Under this computation, he still possessed the entire proceeds of the paycheck and all the cash which he allegedly had when he left his place of employment.

Bailey further testified that as he came out of the tavern, a man whom he identified as the defendant Coulson approached him and forced him at gun point to walk down the cross street to a parked car in which four other men were seated; that he was compelled to get into the front seat of the car; that the defendant Wise sat to his right and Coulson took the driver's position; that Wise twisted his wrist and Coulson took his wallet; that one of the men in the back seat, whom he could not identify said, "Shoot him if he doesn't do what you say"; that he told them he had more money at home and if they would take him there he would get it for them and not inform the police; that the five men drove him to his aunt's home and parked on the opposite side of West Adams Street; that he got out of the car alone, went into the house, talked with his aunt and uncle, called the police, returned to the car, told the men he would come back, and re-entered the house; that while in the house he saw two of the men leave the car, one walking west, and the other east on Adams Street; and that he was unable to describe these men except to say they were colored. He stated that his aunt did not go out of the house at any time prior to the arrival of the police, who appeared five or six minutes after they were called; that the officers parked their automobile in front of the Parrish residence where he met and advised them that there had been five men in the car; that he accompanied them to the automobile in which Coulson, Wise and Beasley were seated and stood by while the officers arrested them and searched their persons and the car; that he observed that neither money nor gun was found, and heard the defendants deny the robbery; and that he went to the police station with the officers and defendants.

Mrs. Parrish testified that after Bailey came into the house he went to a back room to call the police but was

unable to reach them, and that she then called them herself; that she went outside and took the license number of the automobile in which the defendants were seated; that while in the house she saw two men leave the car just before the police arrived; that she watched the policemen arrest the defendants and put them in the squad car, and saw her nephew ride away with them.

Eugene Headtke, one of the arresting officers, stated that while cruising in his car at 12:05 A.M. on July 9, he received a radio report of "suspicious men in an automobile" at 1945 West Adams Street; that the officers drove to that address, met Bailey and took the defendants into custody; that the officers searched the defendants and their automobile, but found no gun or money; that the defendants said they had just driven up and had never seen Bailey before; that neither Bailey nor Mrs. Parrish told him at the time of arrest that two other men were involved; and that he learned of that circumstance when Bailey mentioned it for the first time at the police station.

Police detective Dhooghe questioned the defendants in a routine manner when they arrived at the station, but took no statements and made no further investigation of the case.

Each defendant took the stand and positively denied that he or the other defendants robbed Bailey. Their testimony, substantially the same in all respects, was to the effect that on the night of July 8, they were in Coulson's car parked near his home at 110 South Hoyne Street, just south of Monroe Street, about a block or two east and a block south of the tavern mentioned by Bailey in his testimony; that while they were seated in the automobile, Bailey, who appeared to have been drinking, approached and asked them to drive him home; that Coulson explained that he was almost out of gas and Bailey stated that if they would take him home he would get money to buy some; that they then pushed the car to start it and took Bailey

home; that Bailey got out of the car and told them to wait a minute while he went into the house; that they waited and in a few minutes the police arrived and arrested them. Defendants denied that two other men had been with them at any time that evening or that two men had walked away from the car as related by Bailey and his aunt.

Richard Hite, the proprietor of a mobile lunch stand, testified for defendants and stated that on the evening of July 8, his stand was parked at the corner of Hoyne and Madison streets where there was heavy traffic due to the taverns in the area; that sometime after 11:00 P.M. he saw Bailey approach from the west along Madison Street to a point near the stand where a woman asked him if he wanted to have some fun with her; that Bailey said, "No," and a negro known as Fast Black who was nearby then said, "Oh, this sucker ain't got no money, he is broke"; that Bailey said, "How do you know I ain't?", and Fast Black replied, "Get out, you ain't' nothing but a bum"; that Bailey produced his wallet from his right pocket and as he did so Fast Black snatched it and ran away, followed by three men named Boyd, Jamieson and Davis; that Bailey ran after them shouting for the police; and that the witness told the police about the occurrence and later identified Boyd and Jamieson at a show-up on October 21, 1955. Hite's testimony was denied entirely by Bailey who stated he was not in the vicinity of Hoyne and Madison on the night of July 8.

While we recognize the improbabilities apparent in the story related by the witness Hite, and find this narration to have greater value as fiction than as credible evidence, yet such conclusion, under the law, is not decisive of the issue in question.

This resumé of the testimony shows that the evidence relating to the material facts in issue was conflicting and cannot be reconciled. Under such circumstances it is the duty of a jury, or of a court sitting without a jury, to

determine the credibility of the witnesses and the weight to be given their testimony, and on review, this court will not substitute its judgment for that of the jury or trial court. (*People* v. *Tensley*, 3 Ill.2d 615; *People* v. *Kirilenko*, 1 Ill.2d 90.) But it is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed. (*People* v. *Williams*, 414 Ill. 414; *People* v. *O'Connor*, 412 Ill. 304; *People* v. *Buchholz*, 363 Ill. 270; *People* v. *Fontana*, 356 Ill. 461.) A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, and it is the insufficiency of the People's evidence which creates such doubt. If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case. (*People* v. *Widmayer*, 402 Ill. 143; *People* v. *Cullotta*, 376 Ill. 333; *People* v. *Washington*, 327 Ill. 152.) The foregoing principle of law is a corollary of the presumption of innocence to which a defendant in a criminal case is entitled, and to the rule that the People have the burden of establishing the defendant's guilt beyond a reasonable doubt.

The conviction in this case is based on the testimony of Bailey, the only witness to the alleged robbery. If he is to be believed, the five men who took his wallet, at gun point, voluntarily accompanied him to his home on the vague promise of more money, and permitted him to go inside alone while they obligingly waited outside, trusting that their victim would keep his promise and not call the police. This testimony taxes the gullibility of the credulous. It is reminiscent of the evidence in *People* v. *Buchholz*, 363 Ill. 270, wherein the complaining witness testified that the defendant, after robbing her and finding she had no money, voluntarily accompanied her home and supplied her with his name and telephone number; as well as of the testimony in *People* v. *O'Connor*, 412 Ill. 304, where the victim

of an alleged multiple rape testified that after the attacks, the defendants accompanied her to various taverns where many people were present and allowed her to use the telephone while they waited for her. In each case we held that the testimony was too improbable and unconvincing to sustain a conviction. Where testimony is contrary to the laws of nature, or universal human experience, this court is not bound to believe the witness. *Mannen* v. *Norris*, 338 Ill. 322.

There are other aspects of Bailey's testimony which render it unsatisfactory and unconvincing. He stated that he traveled most of the distance of six miles from his friend's house to the designated tavern by bus, yet the time consumed was at least one and one-half hours. He testified that he contacted the police, but his aunt related that he was unable to reach them and that she called the police. He stated that his aunt did not leave the house until after the arrival of the police, while she testified that she went outside to secure the license number of the car and stated without hesitation that it was 26 846 762, a number in excess by millions of those issued in Illinois in 1955. He testified that he informed the police, upon arrival, that two other men had been in the car but left on foot, while officer Headtke stated that he was not so advised by Bailey until after they arrived at the police station, which was after the search had failed to produce either money or a gun. If two men had departed from the car prior to the arrival of the police, and the police had been so advised when they came to the Parrish home, it is only reasonable to believe that they would have attempted to apprehend them, for presumably these men would have had the gun and money which the search failed to yield. Yet it is undisputed that no such effort was made. If we consider these improbabilities and inconsistencies along with Bailey's obvious reluctance to testify as to his activities during the evening and the amount of liquor which he consumed prior to the alleged robbery,

as well as his vague description of the other men declared to have been with the defendants, it is beyond question that his testimony is not of that clear and convincing quality required to sustain a conviction.

While it is true that Bailey's statements are to some extent corroborated by those of Mrs. Parrish, yet the discrepancies in their testimony are glaring. In addition, much of Mrs. Parrish's testimony is inherently improbable.

Since the evidence for the People in this case is improbable, unconvincing and completely unsatisfactory, we do not hesitate to say that it fails to establish the guilt of the defendants Coulson and Wise beyond a reasonable doubt. This conclusion makes it unnecessary for us to consider further errors assigned.

Since there is nothing in the record to indicate that any different or additional evidence will be available to the People upon remandment for a new trial, we reverse the judgment of conviction without remand.

*Judgment reversed.*

Mr. JUSTICE SCHAEFER took no part in the consideration or decision of this case.