THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARVIN J. STRUCK, Defendant-Appellant.

First District (5th Division)   No. 84—1191

Opinion filed September 27, 1985.

PINCHAM, J., concurring in part and dissenting in part.

James A. Stamos, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Donna B. More, and Marshall C. Libert, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial defendant was convicted of deviate sexual assault and armed violence and sentenced to concurrent six-year terms. Defendant states the issues on appeal to be that (1) there was insufficient proof of force; (2) the trial court erred "in considering out-of-court pre-seizure description of weapon not testified to by complainant," and (3) the armed violence conviction should be vacated because it arose out of the same physical act giving rise to his conviction for deviate sexual assault.

Pertinent testimony is as follows: Complainant, a 19-year-old college student, testified that at 3:30 p.m. on August 8, 1983, he was working as a grounds keeper at a church in Northbrook when defendant drove his blue truck into the church parking lot and while seated in the truck pointed a gun at complainant. Defendant then left the truck and with the gun pointed at complainant's chest told him to go over to some nearby bushes. Complainant, who stated that he was scared because he had been shot once before, went behind the bushes with defendant who, with the gun in his hand, forced complainant to perform an act of oral copulation. When it was completed defendant, still holding the gun, kissed complainant on the mouth and asked him to drop his pants, which he did, and defendant "kissed his butt." Complainant stated defendant then went back to his truck, which was about 15 to 25 feet away, and, upon his return, still holding the gun, gave complainant a bottle of Jack Daniels whiskey and a business

card bearing his name, address and telephone number. He asked complainant to call him "Uncle Marv" and told him that if he ever needed any money he would give it to him. Defendant then left and complainant said that after he had "a couple of swigs," he drove to a park and called his girlfriend. He denied consenting to perform the act of copulation.

On cross-examination the complainant testified that the gun was black, thin and about six inches to eight inches long; that he didn't know what kind of gun it was; that he didn't know what a pellet gun looked like; that the rectory of the church was about a block and a half away and that no one else was around there; and that he didn't run away when defendant went back to his truck because there was nowhere to run.

Complainant's girlfriend stated that when she arrived at the park he was crying and said that "he had been taken advantage of" by a man. He said that he was too embarrassed to go to the police. That same evening they drove to the address printed on the business card he had received from the man and they saw the blue truck he had been driving. Complainant then attempted to call a friend but the friend was not at home. On the following day, after speaking with her employer, she reported the incident to the police and gave them defendant's business card. She later prevailed upon complainant to talk to the police.

Northbrook Police Detective Willis testified that he and Officer Jordan arrested defendant on August 9 at his home. At that time defendant took them to his truck, where they recovered a Crossman pellet gun from the front seat. The gun was received in evidence without objection.

Defendant testified that he was a 50-year-old, self-employed landscaper and at about 3 p.m. on August 8, 1983, he was driving past a church when he saw complainant working and decided to offer him a beer. When he handed him the beer, complainant stated, "You startled me. I thought you had a gun," to which defendant replied, "Why would I pull a gun? I do have one in the [truck] but there is no need to pull a gun on you. I am offering you a can of beer." Defendant said that after talking for a while he asked complainant if he wanted a shot of vodka, and when defendant stated he would rather have Jack Daniels whiskey, he drove to a nearby liquor store, purchased a bottle and on his return gave it to complainant. As they talked he said the conversation turned to sex and he asked complainant "if he had ever gotten it on with another guy." Complainant replied that he hadn't but indicated he would be interested in doing so, and they went into

the bushes, where defendant performed an act of oral copulation on complainant. When he asked complainant to orally copulate him he said that he would have to think about it. Complainant then said that he had to meet his girlfriend at 4:30 p.m. and drove his car to the place where they had been sitting. Defendant described complainant's car as a dark brown Pontiac, two-door sedan with a bench seat. When complainant started to leave, defendant said he gave him a business card and told him he would give him money if he needed it. Defendant also testified that the gun in his truck had been loaned to him by his landlord, and, although he kept it at his shop, he was taking it home that day for safekeeping but had forgotten to take it out of the truck when he arrived home after the occurrence.

Charles Ferrer, owner of a liquor store, testified that defendant came to his place of business to buy beer at about 3 p.m. on the day in question and then returned a half hour later to purchase a bottle of Jack Daniels whiskey. The witness said that although defendant was a frequent customer this was the first time he had purchased Jack Daniels whiskey.

In rebuttal the State presented the testimony of Officer Jordan, who stated that before he arrested defendant on August 9 he went with him to his truck, where Jordan saw and recovered the pellet gun. Prior thereto, complainant had described the gun to him as being long, thin and black.

In finding defendant guilty, the trial court concluded that complainant would not have been able to accurately describe the gun to Officer Jordan had he not seen it at the time of the occurrence.

The first issue presented in defendant's brief—that there was insufficient proof of force—was not supported by any argument; rather, defendant argued only two issues: (a) that it was error for the trial court "to consider rebuttal police hearsay that complainant described gun prior to seizure where consent was defense, complainant's testimony was impeached, uncorroborated, and otherwise unconvincing, and where State never asked him if he did in fact give such a description"; and (b) that "double punishment for the same conduct was improper."

■■ Concerning the first of those arguments, we note that in the rebuttal testimony of Officer Jordan he stated that prior to his arrest of defendant and before Jordan had seen him or his truck, complainant had given him a description of the gun used by defendant as being long, thin and black. Defendant maintains "that the court erred in accepting this hearsay testimony." However, the court is not required to exclude or stop the introduction of improper testimony where, as

here, defendant makes no objection to such testimony and "it is to be considered and given its natural probative effect." (*People v. Akis* (1976), 63 Ill. 2d 296, 299, 347 N.E.2d 733, 735.) Moreover, no prejudice resulted to the defendant since Officers Jordan and Willis had each previously testified that the gun found in defendant's truck was a long, dark gun which matched the description complainant had given them of the gun.

■ The seminal question before the trial court was whether plaintiff consented to the sexual activity with defendant, and the parties agree that the resolution of this question hinged upon the relative credibility of complainant and defendant, specifically as to whether force was used by defendant by use of a gun. The testimony of Officer Jordan was significant in that the trial court concluded that complainant would not have been able to describe the gun had he not seen it, as he testified, in the hand of defendant during the occurrence. In disagreeing with this conclusion, the dissenting Justice here states that complainant "might just as well have acquired his ability to describe the gun from having seen it in the defendant's truck during his drinking and sexual interlude." However, complainant stated that there had been no drinking between them—he having taken "a couple of swigs" after defendant had left the area and it was the testimony of defendant that the drinking was "in a grassy area" and both said that the sexual activity took place behind the bushes. In any event, there is nothing in the record to indicate that any such conduct occurred in or near the truck or that complainant was at any time close enough to the truck to be able to see the gun which defendant said was in a holster on the seat. Thus, there is no record support for the suggestion of the dissenting Justice that complainant might have seen the gun in the truck, and there is clear support for the conclusion of the trial court that complainant would not have been able to describe the gun to Officer Jordan had he not seen it in defendant's hand during the occurrence. It is noted also that defendant does not negate complainant's description of the gun as being long, thin, and black and, although it was apparently a pellet gun, complainant stated that he did not know what a pellet gun looked like and it is clear that he believed it to be a bullet gun. Additionally, defendant does not contend that it did not look like such a gun.

■ We see little merit in the further argument of defendant that complainant's testimony was not credible because he did not make a prompt complaint of the occurrence. It is the province of the trier of fact to determine the credibility of witnesses and the weight to be given their testimony. (*People v. Secret* (1978), 72 Ill. 2d 371, 381

N.E.2d 285.) Where the evidence is conflicting a reviewing court will not substitute its judgment for that of the trier of fact (*People v. Puente* (1984), 125 Ill. App. 3d 152, 465 N.E.2d 682), and a conviction will be disturbed " ' "only where the evidence is so unreasonable, improbable or unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. [Citation.]" ' " (*People v. Kline* (1982), 92 Ill. 2d 490, 506, 442 N.E.2d 154, 161, quoting *People v. Durley* (1972), 51 Ill. 2d 590, 593, and *People v. Adams* (1970), 46 Ill. 2d 200, 209.)

Here, complainant explained that his failure to immediately report the incident to the police stemmed from embarrassment, and given the circumstances of the offense, his youth and the fact that it was his first such experience, we do not find, as suggested by defendant, that by reason of his failure to make a prompt complaint, his testimony was unconvincing.

This case presents a situation in which the testimony of complainant and defendant is almost diametrically opposed. Defendant stated that while he had a holstered gun in his truck he never removed it, whereas complainant said that defendant pointed a gun at him from the truck and continued to do so at all times during the occurrence. Defendant stated that he performed a consensual act of copulation on complainant, who said that he was forced at gunpoint to perform an act of copulation on defendant. Defendant stated that he bought Jack Daniels whiskey because complainant said he preferred that drink and they did some drinking before any sexual activity; whereas complainant denies that he made any such statement or that the whiskey was purchased for him. Defendant says that they drank beer and whiskey and had an extended conversation before the sexual activity took place, but complainant denies drinking or having any conversation with defendant at any time. Complainant's testimony was corroborated to the extent that the police found the unholstered gun in the truck of defendant the next day, and there was no significant corroboration of defendant's testimony by the liquor store owner, as suggested by the dissenting Justice, since he testified only that defendant had purchased beer at about 3 p.m. and returned a half hour later to purchase a bottle of Jack Daniels. He was indefinite as to how he was able to remember after five months that it was about 3:30 when defendant purchased the Jack Daniels, particularly in view of the fact that defendant had been coming to his store practically every day for several years. Complainant testified that defendant drove into the parking area about 3:30 p.m. and, after leaving, did not return.

There are some implausibilities in the testimony of both, and while the dissenting Justice, in recommending reversal, states that

the trial court "apparently ignored the complainant's testimony of the defendant's gift of the liquor and of the business card and the defendant's gift of money to the complainant," which the dissenting Justice believes is "logical and consistent with human behavior if the sex act was consensual," there are other reasons consistent with human behavior for defendant's gifts and card, not the least of which is that defendant may have thought that the young man would be too embarrassed to make a complaint and, by his gifts and suggested loan of money, he would encourage him not to do so and perhaps establish a continuing relationship with him. In any event, the trial court did find the testimony of complainant to be credible on the issue as to whether defendant used a gun to force the sexual act, and, considering the totality of the circumstances, we cannot say that the evidence was not so unreasonable or improbable so as to raise a reasonable doubt as to defendant's guilt.

◾ Defendant's final contention is that his armed violence conviction must be vacated because it was based upon the same physical act which gave rise to his conviction for deviate sexual assault. We and the State agree with this contention (see *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Mormon* (1981), 97 Ill. App. 3d 556, 422 N.E.2d 1065, *aff'd* (1982), 92 Ill. 2d 268, 442 N.E.2d 250), and we vacate the conviction and sentence for armed violence.

Accordingly, the judgment of the circuit court is affirmed in part and vacated in part.

Pursuant to *People v. Nicholls* (1978), 71 Ill. 2d 166, 374 N.E.2d 194, we grant the State's request that defendant be assessed $50 as costs for the State's defending this appeal, and incorporate it as part of the judgment.

Affirmed in part; vacated in part.

LORENZ, J., concurs.

JUSTICE PINCHAM, concurring in part and dissenting in part:

I dissent. The State's evidence not only miserably failed to prove beyond a reasonable doubt that the defendant was guilty of deviate sexual assault or armed violence; more importantly, it was the State's evidence that proved beyond a reasonable doubt that the defendant was not guilty of the commission of those offenses. Inasmuch as the majority opinion vacates the armed violence conviction, I address only the deviate sexual assault conviction.

Section 11—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 11—3) provides, "Any person of the age of 14 years and upwards who, *by force or threat of force, compels* any other person to perform or submit to any act of deviate sexual conduct commits deviate sexual assault." (Emphasis added.) The two essential ingredients of the offense of deviate sexual assault pertinent to the case at bar which were not proven beyond a reasonable doubt, were (1) the defendant's use of force or threat of force; and (2) the compulsory performance of an act of deviate sexual conduct.

The complainant claimed that he was compelled by the defendant's use of force or threatened force to perform an act of oral copulation upon the defendant. The defendant denied the use of force or threatened force and further denied that the complainant orally copulated him. Rather, the defendant readily admitted, when he was arrested and at trial, that he orally copulated the complainant without force or threatened force and with the complainant's consent. It was the State's evidence that proved beyond a reasonable doubt that the act was without force and with the complainant's consent, and this evidence was buttressed by the defendant's evidence to proof beyond any doubt.

The majority opinion aptly points out that it is the province of the trier of fact to determine the credibility of witnesses and the weight to be given their testimony (*People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285), and that where the evidence is conflicting, a reviewing court will not substitute its judgment for that of the trier of fact. (*People v. Puente* (1984), 125 Ill. App. 3d 152, 465 N.E.2d 682.) These legal principles do not justify or require this court to ignore the absurdity of a witness' testimony or the inherent improbability of the events occurring as related by a witness' testimony.

In the case at bar, the complainant's narration of the events has "greater value as fiction than as credible evidence." (*People v. Coulson* (1958), 13 Ill. 2d 290, 295, 149 N.E.2d 96.) In *Coulson*, the supreme court pronounced the following principles:

(1) "[I]t is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed."

(2) "A judgment of conviction can be sustained only on credible evidence which removes all reasonable doubt of the guilt of the defendant, ***."

(3) "If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the

defendant's case."

(4) "The foregoing principle of law is a corollary of the presumption of innocence to which a defendant in a criminal case is entitled, and to the rule that the People have the burden of establishing the defendant's guilt beyond a reasonable doubt."

(5) "Where testimony is contrary to the laws of nature, or universal human experience, this court is not bound to believe the witness." (13 Ill. 2d 290, 296-97.)

The supreme court concluded in *Coulson*:

"The conviction in this case is based on the testimony of Bailey, the only witness to the alleged robbery. If he is to be believed, the five men who took his wallet, at gun point, voluntarily accompanied him to his home on the vague promise of more money, and permitted him to go inside alone while they obligingly waited outside, trusting that their victim would keep his promise and not call the police. *This testimony taxes the gullibility of the credulous.* It is reminiscent of the evidence in *People v. Buchholz*, 363 Ill. 270, wherein the complaining witness testified that the defendant, after robbing her and finding she had no money, voluntarily accompanied her home and supplied her with his name and telephone number; as well as of the testimony in *People v. O'Connor*, 412 Ill. 304, where the victim of an alleged multiple rape testified that after the attacks, the defendants accompanied her to various taverns where many people were present and allowed her to use the telephone while they waited for her. In each case *we held that the testimony was too improbable and unconvincing to sustain a conviction.*" (Emphasis added.) 13 Ill. 2d 290, 296-97.

The complainant's testimony in the case at bar also taxes the gullibility of the credulous and is likewise too improbable and unconvincing to sustain a conviction.

The 19-year-old male complainant testified that he was a full-time student in his sophomore year, majoring in electronics at a community college and that he was employed as a maintenance worker at a church in Northbrook. At about 3:30 p.m. on the afternoon of August 8, 1983, the complainant was "weeding" on the church grounds "at the back of the parking lot." A two-ton, blue pickup truck pulled into the parking lot. The driver of the truck, the defendant, pointed a gun at the complainant's chest, stepped out of the truck and told the complainant to go to the bushes, about 12 feet away. As they walked to the bushes, the defendant told the complainant that he knew the Padre. Upon arrival in the bushes, the defendant kept the gun pointed

at the complainant's chest and ordered the complainant to orally copulate him. The complainant pulled down the defendant's clothing. The defendant, with the gun still pointed at the complainant, lay on the ground and the complainant orally copulated him. Thereafter, the defendant got up and pulled up his clothing, with the gun still in his hand. The complainant remained seated on the ground. The defendant kissed the complainant and told him to pull down his jeans. The complainant did so and the defendant kissed the complainant on his buttocks. As the defendant pointed the gun at the complainant in the bushes, a car drove by, made a U-turn, stopped for a few seconds and drove away.

It is the complainant's testimony of the following events which casts grave and serious doubt on the complainant's foregoing version of events and causes his foregoing version of events to be unbelievable, improbable, unconvincing and contrary to the laws of nature and universal human experience.

The complainant testified that after the car drove away from the parking lot, the defendant went to his truck and got a bottle of Jack Daniels whiskey and gave it to the complainant. The complainant denied at the preliminary hearing that he drank any of the whiskey. At trial, however, the complainant testified that when the defendant gave him the bottle, he "opened it up and had a couple of swigs." The complainant testified further that after the defendant gave him the bottle of whiskey, the defendant took a business card from his pocket and also gave it to the complainant. The complainant testified that the card had the defendant's name, Marvin Struck, the defendant's address and the defendant's telephone number written on it.

The complainant stated further that when the defendant gave him the bottle of whiskey and his business card, the defendant told the complainant to call him "Uncle Marv" and that if he needed money, "like $20.00, but not in excess," the defendant would give it to him. Thereupon, the defendant departed.

Thus, it was the testimony of the complainant that the defendant, a total stranger, on church grounds, in midafternoon, forced the complainant at gunpoint to commit the despicable offense of forced oral copulation upon the defendant and that the defendant immediately thereafter gave the complainant a bottle of whiskey and his business card, which contained the defendant's name, address and telephone number, told the complainant to call him "Uncle Marv" and offered the complainant up to $20 whenever he needed it. This testimony taxes the gullibility of the credulous.

The complainant's testimony is reminiscent of the complainant's

testimony in *People v. Buchholz* (1936), 363 Ill. 270, 2 N.E.2d 80, that after the defendant robbed her and found that she had no money, the defendant then escorted the complainant home and gave her his name and telephone number. The court in *Buchholz* held that the complainant's testimony was too improbable and unconvincing to sustain a conviction. The foregoing testimony by the complainant in the instant case is likewise too improbable and unconvincing to sustain a conviction.

The complainant's testimony in this case is strikingly similar to the complainant's testimony in *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801. In *Kepler*, the complainant also testified that the defendant gave her his business card, on which was printed the name of the defendant's employer, the defendant's name, office address and office telephone number. The complainant testified further in *Kepler* that approximately three weeks thereafter, while on a date, the defendant raped her. The rape conviction in *Kepler* was reversed. The deviate sexual assault conviction in the case at bar should also be reversed.

The complainant's conduct when the defendant departed from the church grounds is equally bizarre. The complainant testified that after he was forced at gunpoint to perform an act of oral copulation, and after the defendant departed, the complainant went to the garage and put the weed eater away, locked it up and then went inside the church to the office to see what time it was. There is no explanation in the record for this purportedly sexually assaulted victim's concerns for securing the weed eater in the garage or for entering the church office to determine the time. Such concerns and actions of a person who had just been forceably sexually assaulted certainly seem rather strange.

In any event, the complainant further testified at trial that he found out the time when he went into the church, but that he did not remember what that time was. He admitted that "[I]t was close to closing because I locked up the doors then," and that closing time was 4:30 p.m. By the complainant's own time frame, he and the defendant had been together for at least an hour. This prolonged period of time would appear to be incompatible with the complainant's version of the events, but compatible with the defendant's version.

The complainant testified further that even though he knew there were phones in the church, he did not go there to use them. More importantly, he did not talk to anyone. He stated that after he locked the church, he went to his car and drove to the park, where he sat for 10 to 15 minutes.

The complainant testified that from a park telephone, he called

his girlfriend at her home. He did not call the police nor did he ask his girlfriend to call the police. He merely told her on the telephone that he needed to talk to her and then returned to his car. About five minutes later, his girlfriend arrived, at which time, the complainant testified, he was sitting in his car crying. His girlfriend asked him what happened, but the complainant did not tell her. They went by a lake in the park and there, the complainant testified, he told his girlfriend what had happened.

The complainant testified further that after he told his girlfriend what had happened, they went to her house. Later that night, at about 9:30 p.m., the complainant and his girlfriend drove in the complainant's car to the address on the card that the defendant gave the complainant. The address was a house at which the complainant saw the defendant's two-ton, blue pickup truck. The complainant testified that he and his girlfriend then drove to the Plaza Del Prado, from which the complainant unsuccessfully attempted to telephone his friend, Rick, because he wanted to kill the defendant and wanted help.

If the act of oral copulation was without force and was free and voluntary, as the totality of the State's evidence established, and as the defendant testified that it was, then the complainant's belated shameful embarrassment and his desire and actions for revenge are understandable. On the other hand, if the complainant was forced to perform the act at the point of a gun, it would seem somewhat strange that the complainant would seek revenge in the manner described or that he would take his girlfriend on his mission of revenge against his assailant, who he knew was armed with a gun.

Unable to reach his friend, Rick, the complainant and his girlfriend returned to her home, where the defendant spent the night. The complaint did not tell his girlfriend's parents what had happened, nor did he call the police.

The complainant testified that the following morning he returned to work at the church. Later in the afternoon, at about 2 o'clock, his girlfriend and her brother came to the church. She told the complainant that she had gone to the police and that the complainant had to talk to them. The complainant was on the church roof tarring. He stated that he came down and talked to the church receptionist, the church housekeeper and a nun. He did not tell them what had happened. He thereafter went to the Northbrook police station, where he talked to police officers. The complainant testified that he did not go to the police earlier because he was embarrassed.

In *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467, the

supreme court reversed the defendant's rape conviction because the testimony of the complainant was not sufficiently convincing to lead to an abiding conviction of guilt. The court pointed out that the complaint could be accounted for by the complainant's belated sense of guilt. In *DeFrates,* the rape complaint was immediate, although occasioned by the complainant's belated sense of guilt. In the instant case, the deviate sexual assault complaint was belated, as was the complainant's sense of guilt.

In reversing the defendant's rape conviction, the supreme court pointed out in *People v. Kepler* (1966), 76 Ill. App. 2d 135, 143, 221 N.E.2d 801, that the victim's immediate complaint "may well have been the result of a belated sense of guilt of what had transpired earlier in the evening." In the case at bar, in view of the complainant's untimely complaint and belated sense of guilt, the testimony of the complainant's girlfriend, who was called as a State's witness, is quite revealing. She testified that she arrived home on the afternoon of August 8, 1983, at approximately 4:45 p.m. and that she had been home for about 15 or 20 minutes when she received a telephone call from the complainant. The complainant told her he was at the park and wanted her to come there. She asked the complainant what was wrong because she could tell from the complainant's voice that he was upset, but the complainant did not answer her inquiry. The complainant's girlfriend testified further that she went to the park in her automobile, parked next to the complainant's car and then got in the complainant's car. She further testified:

"Q. Can you tell us what was [the complainant] doing when you were in his car?

A. He was crying.

Q. Did you speak to him while he was crying in his car?

A. Yes.

Q. What did you say to him?

A. *I asked him what was wrong.*

Q And what did he do?

A. He kept crying.

Q. *Did you ask him that question again?*

A. Yes.

Q. And what did he do?

A. He took my hand and led me by the lake where we used to sit in the park.

Q. Now, when you arrived by the lake where you used to sit in the park, did you ask [the complainant] anything again, or did he say anything to you at that time?

A. *Yes, I kept asking him what was wrong.*

Q. And what was he doing while you were asking the questions?

A. He was crying.

Q. *Did he answer your question?*

A. *Eventually, yes.*

Q. And what did he tell you?

A. He told me that he had bee taken advantage of." (Emphasis added.)

According to the Criminal Code of 1961, the offense of deviate sexual assault, like the offense of rape, must be perpetrated upon a person by force and compulsion or by force and against the person's will. (Ill. Rev. Stat. 1981, ch. 38, pars. 11—3 and 11—1, respectively.) In *People v. Szybeko* (1962), 24 Ill. 2d 335, 339, 181 N.E.2d 176, the supreme court held:

"Evidence that the prosecutrix made a complaint soon after the commission of the [rape] offense is indeed accepted for the purpose of corroborating her testimony, *but to be admissible and to have corroborative value, the complaint must have been made voluntarily and not in response to questions and answers, and must have been a spontaneous outburst or expression of the prosecutrix's outraged feelings,* rather than a mere recital of past events." (Emphasis added.)

Based on the supreme court's holding in *Szybeko*, the complainant's complaint to his girlfriend in the case at bar had no corroborative value, not only because the complaint was belatedly made, but also because it was not a spontaneous outburst or expression. Instead, the complaint was a reluctant response to repeated and persistent questions. The complainant's complaint to his girlfriend does not corroborate an alleged act of forced oral copulation, any more than it corroborates the complaint's belated sense of guilt for his act of voluntary oral copulation.

The complainant's girlfriend stated that she accompanied the complainant to the residence of the defendant, whose name and address, she testified, were on the business card the defendant had given to the complainant. She also saw the defendant's two-ton, blue pickup truck at the defendant's residence. She stated that after the complainant was unable to contact his friend, Rick, she and the complainant returned to her home. The following testimony was then elicited from the complainant's girlfriend:

"Q. [A]t any time that evening while you were with [the complainant], did you ever ask him to do anything?

A. Yes, I asked him to go to the police.

Q. And what did he tell you?

A. No.

Q. Did he tell you why?

A. Because he was too embarrassed. He said he felt like a faggot."

Again, this testimony about the complainant's embarrassment, his reluctance to report the incident to the police and his feelings of homosexuality does not corroborate the complainant's charge of involuntary, forced oral copulation.

The complainant retained the whiskey and the defendant's business card which the defendant gave him and both were admitted into evidence as State's exhibits. These two items of physical evidence corroborate, substantiate and indeed establish, beyond a doubt, that the sex act was consensual and was not coerced.

The record discloses that the defendant was 54 years of age, lived with his wife of 30 years, had three adult sons, was a 16-year Glenview resident, and for seven years had been a self-employed landscaper and had no criminal record. He testified that he was bisexual and that he orally copulated the complainant with the complainant's consent. In fact, when the investigating arresting officer initially confronted the defendant, he promptly admitted the act and that it was with consent, but protested that he had committed no offense because the complainant was "of age." If the defendant had in fact committed the offense of forcing the complainant to orally copulate him, and he endeavored, when confronted, to exculpate himself by admission of the act and a false denial of his use of force, it would seem that the defendant, rather, would have denied commission of the act altogether. The defendant's version of the incident is set forth in the majority opinion and need not be here repeated. It is sufficient to merely point out that the trial court rejected the defendant's testimony. Remarkably, however, the trial court apparently ignored the complainant's testimony of the defendant's gift of the liquor and his business card and the defendant's offer of money to the complainant. If the sex act was involuntary and by force, then this testimony is absurd. This testimony, however, is logical and consistent with human behavior if the sex act was consensual. Moreover, the defendant's testimony was corroborated by an impartial witness, the liquor store proprietor, from whom the defendant purchased the beer and liquor which he gave the complainant.

The trial court relied on the arresting officer's rebuttal testimony of the complainant's dubious pre-arrest description of a gun which

was in the defendant's truck when he was arrested. Even if this inadmissible hearsay rebuttal testimony can be relied on as legally competent, substantive evidence because no objection to it was appropriately made, nevertheless, this testimony is indeed an extremely tenuous basis on which to predicate, even in part, a guilty finding. The defendant's gun, admitted into evidence as a State's exhibit, was a pellet air gun, which the defendant testified he used to keep rabbits out of his garden. The complainant might just as well have acquired his ability to describe the gun from having seen it in the defendant's truck during his drinking and sexual interlude with the defendant which occurred over a protracted time period, even by complainant's calculation. No evidence was presented that the complainant was not at or near the defendant's truck during the episode. More importantly, there was no evidence that the complainant did not look into or could not have seen inside the complainant's truck, where the defendant testified the gun was situated. Thus, the record clearly fails to refute the probability that the complainant's description of the pellet gun could have been acquired on the church grounds, the scene of the sex act. The complainant might have seen the gun in the defendant's truck at the defendant's home. The evidence does not preclude either of these probabilities. The trial court's conclusion, as well as the conclusion of the majority, "that complainant would not have been able to describe the gun to Officer Jordan had he not seen it in defendant's hand during the occurrence," is equally speculative.

The arresting officer's peripheral testimony of the complainant's description of the defendant's pellet gun was an inadequate and unsound basis for the trial court's disregard of the complainant's testimony which established the defendant's innocence, or for the trial court's disregard of the defendant's testimony and the testimony of the unbiased liquor store owner, which corroborated it.

The majority concedes that "there are implausibilities in the testimony of both" the complainant and the defendant. The defendant's testimony was far from implausible. However, the complainant's testimony was implausible and failed to fulfill the State's burden of proving the defendant's guilt beyond a reasonable doubt. Indeed, it was the implausibility of the complainant's testimony that created the reasonable doubt of the defendant's guilt.

Again, the defendant was not proved guilty beyond a reasonable doubt. It was the State's evidence which proved beyond a reasonable doubt that the defendant was not guilty of using force to compel the complainant to commit the sex act. The defendant's judgment and conviction of deviate sexual assault should therefore be reversed.