THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK GALVIN, Defendant-Appellant.

First District (4th Division)   No. 1—89—0846

Opinion filed December 20, 1990.

Robert G. Grossman, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Jane E. Loeb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant, Patrick Galvin, was charged by indictment with three counts of criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—13), and two counts of criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—15). Following a jury trial, defendant was found guilty of criminal sexual assault and sentenced to five years in the Illinois Department of Corrections.

On appeal, defendant contends that the evidence presented at trial was so implausible, inconsistent, and contrary to human experience as to raise a reasonable doubt as to his guilt. Defendant also alleges that he was denied a fair trial because the prosecution witness, Judith Ivins, invaded the province of the jury by vouching for the complainant's credibility and ability to distinguish fantasy from reality.

We affirm.

BACKGROUND

The complainant is afflicted with Downs Syndrome. She had the obvious physical characteristics unique to people with Downs Syndrome including slanted eyes, a small stature, and a speech impediment. She was 28 years of age chronologically and 10 years old mentally at the time of defendant's trial. Complainant was initially examined, in chambers, by Judge Zafiratos in order that he might determine whether she could appreciate the difference between telling the truth and telling a lie. She was found competent to testify. She then testified before the jury.

Complainant testified that she worked in the Helping Hand Thrift Shop in Brookfield, Illinois, on Saturday, February 14, 1987. She was responsible for tidying the men's clothing section of the thrift shop, which was located in the rear section of the second floor. At 1:30 p.m., complainant was performing her usual duties in the men's clothing section. According to the witness, defendant approached her and said, "Hi, my name is Pat." She responded by greeting defendant and telling him her name. Defendant then touched her right shoulder and patted her buttocks. Next, defendant kissed her upon her cheek and her lips. The witness testified that she "tr[ied] to back away." She attempted to hide in the dressing room, but defendant followed her, fondled her breasts, and kissed her again. Defendant then left.

Complainant's mother testified that while she was driving her daughter home from the thrift shop on February 14, 1987, complainant said that she met a new friend named Pat. She then told complainant not to speak to or kiss strangers.

On Saturday, February 28, 1987, defendant returned to the thrift shop. Complainant was working in the workroom with the door closed. The door had a sign on it which read "no admittance." At 1:45 p.m., defendant entered the room where she was working and closed the door, after she told him not to enter. Defendant kissed her on the lips and fondled her breasts. Defendant unbuttoned her brassiere and tried to pull it up. The witness told the court that defendant kept pulling her brassiere up while she continued to pull her brassiere down. Defendant then pulled down his sweatpants and his underwear, exposing his penis. Complainant testified that defendant told her to perform an act of fellatio. She leaned over and put his penis in her mouth. Defendant then removed his penis from her mouth and told her he would show her what to do. According to the witness, defendant put his thumb in her mouth and moved it in and out of her mouth in a circular motion. Defendant then removed his thumb from her mouth. He placed his left hand on his penis and his right hand behind her head and forced her to perform fellatio on him for approximately two minutes. Complainant stated that during this time, she tried to back away.

Before leaving, defendant threatened complainant by warning her not to tell anyone or else he would bring her to his house and make love to her. Defendant thereafter left the workroom. He exited the thrift shop through a fire door whereby people could leave the store without being seen on the first floor.

Immediately after the assault, complainant was nervous, and she began crying. After five minutes, she went downstairs and told her mother that she had been raped. When the police arrived, complainant gave them a description of her assailant. She told the police that the suspect had brown hair parted down the middle of his head, and that he wore glasses, blue sweatpants, an army jacket, and gym shoes with no socks. Ms. Susan Butler, another worker in the thrift shop, passed defendant in the hallway, but she did not observe what defendant was wearing below the waist.

On the evening of February 28, 1987, complainant went to Hinsdale Hospital, where she was examined by Dr. Walker and Nurse Terry Sanders. The health care providers found no physical evidence of the assault. However, the parties stipulated that Nurse Sanders, if called as a witness, would testify that she interviewed complainant on

February 28, at 6:12 p.m., and that complainant said that "Pat, the worker" held her by the neck and forced her to put his penis in her mouth.

On March 21, 1987, complainant was working on the second floor of the thrift shop where she saw defendant, wearing the same clothes that he wore on the day he assaulted her. Complainant's mother telephoned the police. Lieutenant Arthur Kuncl arrested defendant and read him his *Miranda* rights. Lieutenant Kuncl later testified that defendant lived less than a block away from the thrift shop and that there was a clear line of vision from his house to the store. Complainant, her mother, and Ms. Butler all separately identified defendant in a lineup at the police station later that afternoon.

On June 29, 1988, complainant was interviewed by Dr. Judith Ivins. Dr. Ivins is a psychologist who has studied mental retardation. Dr. Ivins interviewed complainant in order to determine whether she was able to understand and consent to the act with defendant. Dr. Ivins testified that complainant gave a detailed description of her encounter with defendant. In addition, she testified that complainant had an understanding of the rudiments of vaginal intercourse and its role in procreation, but that she had no understanding of oral sex, or male sexual gratification associated with fellatio, and no comprehension of how sexual activity fits in the context of a relationship. Dr. Ivins also stated that complainant conveyed that the incident with defendant was wrong, or was something with which she did not want to be involved. Dr. Ivins further testified that complainant was well able to remember details although she could not "sequence" them or understand their social implications.

Finally, Dr. Ivins told the court complainant said that she wanted to be "President," and that she had 510 boyfriends. Dr. Ivins characterized these comments as pre-teenage romantic notions. Dr. Ivins reiterated that complainant gave a detailed description of her encounter with defendant, and she maintained that complainant could distinguish these mild fantasies from her encounter with defendant.

Defendant testified in his own behalf. He claimed that he did not own an army jacket and that he has always worn glasses. He agreed that the photograph of him in the police lineup showed his hair parted down the center of his head. Defendant denied that he was in the thrift shop on February 14 or 28; but, he admitted that he had been in the thrift shop several times and that he was in the shop on the date of his arrest shopping for curtains during half-time of a college basketball game. After hearing all of the evidence, the jury found defendant guilty of criminal sexual assault.

Opinion

Defendant contends on appeal that the evidence elicited at trial was so implausible, inconsistent, and contrary to human experience as to raise a reasonable doubt of his guilt. He claims that it is contrary to human experience to believe that an individual would commit a criminal offense just one block away from his residence, introduce himself to the victim and use his real name, and return to the scene of the crime two weeks later wearing the same clothing. Defendant further contends that there was no physical evidence of his crime. The People maintain that the evidence showed defendant was guilty of criminal sexual assault beyond a reasonable doubt.

■■ "It is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." *People v. Young* (1989), 128 Ill. 2d 1, 51.

■ It is the duty of a reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■ A reviewing court must reverse a criminal conviction if the evidence is improbable, unconvincing, or contrary to human experience. (*People v. Coulson* (1958), 13 Ill. 2d 290, 296-97.) However, it is not the function of the reviewing court to retry a defendant when reviewing a challenge to the sufficiency of the evidence of his guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 261.

Upon reviewing the evidence in the light most favorable to the prosecution, we conclude that a reasonable jury could have found the elements of criminal sexual assault and found defendant guilty of that offense beyond a reasonable doubt. The evidence in this case is not improbable, unconvincing, or contrary to human experience.

■ The Criminal Code of 1961 states in pertinent part:

"(a) The accused commits criminal sexual assault if he or she:

(1) commits an act of sexual penetration by the use of force or threat of force; or

(2) commits an act of sexual penetration and the accused knew that the victim was unable to understand the nature of the act or was unable to give knowing consent ***." Ill. Rev. Stat. 1989, ch. 38, par. 12—13.

■ The evidence construed in the light most favorable to the prosecution reveals that defendant committed an act of penetration

by putting his penis in complainant's mouth after forcing her to bend over and while holding her by the neck. Sexual penetration includes "any contact, however slight between the sex organ of one person and the *** mouth *** of another person." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).) The threat of force includes situations where a defendant threatens violence, or where a defendant overcomes a victim by use of superior strength. (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(d)(2).) The record also shows the accused may have known that complainant was unable to understand the nature of the act of fellatio, or that she was unable to give knowing consent to such an act because she had the obvious physical characteristics unique to persons with Downs Syndrome.

■ Although there was no physical evidence of this crime, a reasonable jury could have convicted defendant because the Criminal Code of 1961 indicates that physical evidence is not required to convict a defendant of criminal sexual assault. Penetration is an element of criminal sexual assault. However, "[e]vidence of emission of semen is not required to prove sexual penetration." Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).

■ We also find that the evidence in the record is not improbable, unconvincing, or contrary to human experience. It is not unbelievable that defendant would commit a crime within one block of his home. Defendant could see the parking lot of the thrift shop from his home. He had the opportunity to identify complainant and monitor her activities. Furthermore, it is not implausible that defendant would tell the complainant his name, or return to the scene of the crime wearing the same clothing. Complainant's handicap was apparent. Defendant could have easily recognized her handicap and most likely believed that she would not remember his name or his clothing. "[S]imply because the evidence depicts [a] rather daring and foolish criminal[] does not by itself render the State's evidence unbelievable." (*People v. Bullock* (1977), 51 Ill. App. 3d 149, 154.) We do not believe that the evidence was improbable, incredible, or contrary to human experience. Therefore, we will not set aside the jury's verdict.

Defendant next contends that he was denied a fair trial because Dr. Judith Ivins invaded the province of the jury by vouching for complainant's credibility and ability to distinguish fantasy from reality. The People maintain that defendant failed to make a timely objection to the testimony. The State also argues that if we should reach the merits of this issue, Dr. Ivins' testimony was correctly allowed because she testified regarding complainant's ability to distinguish between the act with defendant and her fantasies.

"[T]he accused has the right to insist that only competent evidence shall be introduced against him [at trial] ***." (*People v. Trefonas* (1956), 9 Ill. 2d 92, 98.) However, the admission of evidence must be objected to at the time of the admission. Defendant waives his right by failing to object during the trial. (*Trefonas*, 9 Ill. 2d at 98.) Failure to make a proper and timely objection constitutes a waiver of the right to object on appeal. Defendant in the case at bar failed to object to the testimony at issue during the trial. Accordingly, we find that defendant waived his right to raise this issue upon appeal; therefore, we cannot address the merits of defendant's objection.

For the foregoing reasons, we affirm the trial court's decision. As part of our judgment, we grant the State's request that defendant be assessed $75 as costs and fees for this appeal, pursuant to *People v. Agnew* (1985), 105 Ill. 2d 275, and *People v. Nicholls* (1978), 71 Ill. 2d 166.

Affirmed.

LINN and JIGANTI, JJ., concur.